## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL D. COHEN,<br><br>       *Petitioner,*<br><br>v.<br><br>WILLIAM BARR, in his official capacity as Attorney General of the United States, MICHAEL CARVAJAL, in his official capacity as Director of the Bureau of Prisons, and JAMES PETRUCCI, in his official capacity as Warden of the Federal Correctional Institution, Otisville,<br><br>       *Respondents.* | No. 20 Civ. 5614 |

## VERIFIED PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241

Petitioner Michael D. Cohen, by and through his attorneys, Perry Guha LLP and the American Civil Liberties Union Foundation, alleges, based on personal knowledge as to himself and his own circumstances and on information and belief as to all other matters, as follows:

### PRELIMINARY STATEMENT

1.     Petitioner Michael Cohen is currently being held at the Federal Correctional Institution in Otisville, New York ("FCI Otisville"), in solitary confinement. He is being held in retaliation for his protected speech, including drafting a book manuscript that is critical of the President—and recently making public his intention to publish that book soon, shortly before the upcoming election.

2.     For more than a decade, Mr. Cohen was now-President Donald J. Trump's personal lawyer. Mr. Cohen is writing a book about his experiences—as Respondents and other Bureau of Prisons ("BOP") officials know, and at all relevant times knew. Mr. Cohen has publicly announced

that, in the run-up to the 2020 presidential election, he intends to tell the American people about Mr. Trump's personality and proclivities, his private and professional affairs, and his personal and business ethics.

3.      From May of 2019 until May of 2020, Mr. Cohen was held at FCI Otisville after pleading guilty to offenses including lying to Congress on behalf of Mr. Trump and committing campaign finance violations on behalf of Mr. Trump.

4.      In April of this year, the BOP determined that Mr. Cohen was at serious risk of sickness and death if he remains in custody at Otisville, where, on information and belief, approximately one-half of the prisoners have become infected with COVID-19. Because of his high co-morbidity risk factors—including severe hypertension and a history of respiratory compromise—and pursuant to a BOP policy mandated by Act of Congress, Respondents released Mr. Cohen on furlough in May 2020. It also determined that, once his term of furlough concluded, Mr. Cohen would be transitioned into home confinement for the duration of his term of imprisonment.

5.      While on furlough, Mr. Cohen repeatedly made public his intention to publish his book about President Trump soon. For example, on June 26, 2020, he tweeted #WillSpeakSoon. On July 2, 2020, he tweeted that he was putting the finishing touches on what promised to be a tell-all book about his experience with Mr. Trump.

6.      Just one week later, on July 9, 2020, U.S. Probation Officers, working on behalf of the BOP, presented Mr. Cohen with an unconstitutional demand: As a condition of his release—a release BOP already had determined was necessary to protect Mr. Cohen's health—he had to agree to a complete bar on speaking to or through any media of any sort, including via a book.

7.      Because he was fearful for his life should he be remanded to FCI Otisville, he did not refuse. Instead, he and his lawyer noted his desire to continue working toward publication of his book and sought both clarification on and limitation of the prohibition on speaking. The Probation Officers told Mr. Cohen that they would run those requests "up the chain" to higher-ups at BOP; instead, Mr. Cohen was remanded to FCI Otisville, where he remains in solitary confinement today. On information and belief, BOP officers took each of these actions under the direction of Respondents.

8.      Respondents' imprisonment of Mr. Cohen violates the Constitution. The First Amendment forbids Respondents from imprisoning Mr. Cohen in retaliation for drafting a book about the President and for seeking to publish that book soon—an intention he expressed publicly in recent weeks and also privately to Respondents when presented with the categorical prior restraint on his speech. This Court should grant the Petition and order Mr. Cohen's immediate release to home confinement.

## THE PARTIES

9.      Petitioner Michael D. Cohen is a 53-year old man now imprisoned in the custody of the BOP at FCI Otisville.

10.      Respondent William Barr is the Attorney General of the United States and is being sued in his official capacity. As Attorney General, Respondent Barr is the head of the U.S. Department of Justice and the chief law enforcement officer of the Federal Government. He is responsible for oversight of the BOP. Respondent Barr has issued directives and guidance to the other Respondents that govern the treatment of Petitioner and similarly situated prisoners.

11.     Respondent Michael Carvajal is the Director of the BOP and is being sued in his official capacity. As Director of the BOP, Respondent Carvajal oversees the operations of FCI Otisville and is responsible for oversight and management of FCI Otisville's staff and prisoners.

12.     Respondent James Petrucci is the Warden of FCI Otisville and is being sued in his official capacity. As Warden, Respondent Petrucci reports to Respondent Barr and Respondent Carvajal. Respondent Petrucci oversees all day-to-day activity at FCI Otisville.

## JURISDICTION AND VENUE

13.     Petitioner brings this action pursuant to 28 U.S.C. § 2241 for relief from unlawful detention that violates his First Amendment rights.

14.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1651 (All Writs Act), Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), and 28 U.S.C. § 1331 (federal question).

15.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 2241(d) because Petitioner is in custody in this judicial district and venue. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred in this district.

## STATEMENT OF FACTS

### A.     Mr. Cohen's Book

16.     Mr. Cohen worked as Mr. Trump's lawyer and personal adviser for close to a decade, first at the Trump Organization, then as part of the 2016 Trump Presidential Campaign, and finally once Mr. Trump became President. Throughout this time, Mr. Cohen communicated with Mr. Trump regularly, and participated in and witnessed first-hand the decision-making and inner workings of his business, campaign, and administration.

17.     On November 27, 2018, Mr. Cohen pled guilty to multiple violations of federal law arising out of that work, among other charges, and was thereafter sentenced to a term of imprisonment of 36 months. On May 6, 2019, Mr. Cohen voluntarily surrendered for service of his sentence at FCI Otisville.

18.     Following Mr. Cohen's conviction, he began work on a manuscript about how he had lost his moral compass over his years working for Mr. Trump. Because Mr. Trump is now President Trump, and because 2020 is an election year, Mr. Cohen's book naturally addresses a subject matter of great national concern and intense public interest.

19.     Mr. Cohen's book describes Mr. Cohen's first-hand experiences with Mr. Trump, and it provides graphic details about the President's behavior behind closed doors.  For example, the narrative describes pointedly certain anti-Semitic remarks against prominent Jewish people and virulently racist remarks against such Black leaders as President Barack Obama and Nelson Mandela. The book will rely upon and publish numerous previously unknown anecdotes, supported by documentary evidence.

20.     Mr. Cohen has also publicly stated that the book will be unfavorable, including descriptions of Mr. Trump—as Mr. Cohen made clear during his Congressional testimony—as "a cheat, a liar, a conman, a racist," and more.

21.     Mr. Cohen began working on the manuscript shortly after he arrived at Otisville. He continued working on it throughout his term there, fully consistent with BOP regulations, and was able to do so while housed in the general population at the Otisville camp.

22.     BOP has instituted policies specifically to "encourage inmates to use their leisure time for creative writing and to permit the direct mailing of all manuscripts as ordinary correspondence." *See* Bureau of Prisons, *Program Statement Re: Inmate Manuscripts* (July 27,

1999). The policy provides that "[a]n inmate may prepare a manuscript . . . for publication while in custody without staff approval," and "may mail a manuscript as general correspondence." *Id.* §§ 551.81, 551.82.

23.     Mr. Cohen served his sentence quietly and without incident, living and working with other prisoners in the general population section of the Otisville camp.  On information and belief, his conduct record was immaculate.

24.     Mr. Cohen did most of his writing in plain sight in the law library. Indeed, staff at Otisville, including Camp Administrator Robert Schreffler and Correctional Counselor James DeLeo, explicitly informed Mr. Cohen that they were aware he was writing a book.

**B.     The BOP Releases Mr. Cohen From Prison to Protect Against the Threat from COVID-19**

25.     Mr. Cohen originally was scheduled to be released from Otisville after completing his sentence on November 22, 2021. This changed with the onset of the COVID-19 public health crisis in early 2020.

26.     COVID-19, the sickness caused by the novel coronavirus SARS-CoV-2, is easily transmissible in the close quarters of federal prisons, threatening the life and health of prisoners and staff alike.

27.     To help protect prisoners and staff from the spread of COVID-19, Congress authorized expanded home incarceration for federal prisoners under the CARES Act. Pursuant to the CARES Act, Respondent Barr directed the BOP to evaluate prisoners for release based on their health risks.

28.     Mr. Cohen is at high risk of severe or life-threatening consequences if he contracts COVID-19. As noted, Mr. Cohen suffers from severe hypertension and has a history of respiratory

compromise. While at FCI Otisville, Mr. Cohen twice required emergency medical treatment in February 2020.

29.     Following Respondent Barr's March 26, 2020 memorandum and the passage of the CARES Act the next day, FCI Otisville staff invited prisoners to submit what is known within the BOP as a BP-8 form. This document allowed each prisoner to articulate the basis for his application to be released to home confinement in light of the COVID-19 pandemic. On March 31, 2020, Mr. Cohen submitted his BP-8 form, requesting that he be transferred to home confinement due to his medical history. Mr. Cohen also provided Respondents with medical records to demonstrate his need for alternate settings outside of the BOP facilities in which to serve the remainder of his sentence without jeopardizing his health.

30.     The BOP determined that Mr. Cohen should be released on furlough and then transferred to home confinement. Upon information and belief, it did so after a careful assessment of his medical condition and COVID-19 co-morbidity factors. On information and belief, the BOP made the determination that Mr. Cohen was at serious risk should he remain at FCI Otisville and, pursuant to the directives of the CARES Act and Respondent Barr's general instruction and findings, initiated the process for Mr. Cohen to serve the remainder of his sentence on furlough and then in home confinement, to ensure his safety.

31.     On or about April 18, 2020, Mr. Cohen was provided with a furlough approval by the BOP, which Mr. Cohen counter-signed.  The furlough approval indicated that Mr. Cohen was approved by the BOP for furlough from May 1, 2020 to May 31, 2020.

32.     On or about May 21, 2020—after a period of solitary confinement purportedly meant to quarantine Mr. Cohen before he was released, but which lasted far beyond the 14-day

quarantine period—Mr. Cohen was released pursuant to a new Furlough Approval, dated May 21, 2020.

33.     On information and belief, furlough approvals such as the one signed by Mr. Cohen place certain restrictions on inmates but generally allow them greater liberties than they enjoy while on home confinement. For example, under furlough approvals, inmates are not confined to their homes, but instead are permitted to travel within the "area" of their residence

34.     Upon returning to his home under the Furlough Approval on May 21, 2020, Mr. Cohen complied diligently with the express terms of the Furlough Approval and with the oral instructions and guidance of the Otisville personnel, including his weekly telephonic check-in with the BOP.  Mr. Cohen also filled his time, as he had at Otisville prior to his detention in solitary confinement, by writing and editing his book.

35.     Consistent with the language of the Furlough Approval and the guidance from the staff at FCI Otisville, Mr. Cohen was permitted to travel near his apartment, but he limited his neighborhood outings to short walks within a close perimeter of his apartment.

36.     On or about June 19, 2020, approximately thirty days after Mr. Cohen's delayed release on furlough, the BOP had not yet completed the steps required to transition Mr. Cohen to home confinement as planned.  While the initial Furlough Approval, which was originally intended to cover the period from May 1, 2020 through May 31, 2020, had expired, the BOP voiced no concern about Mr. Cohen's compliance and instead extended the Furlough Approval.

C.     **Mr. Cohen Announces Plans to Publish His Book Shortly Before the Election**

37.     While on furlough, Mr. Cohen posted several tweets making clear that he was writing a book and that he planned to publish it imminently.

38.     For example, on June 26, 2020, he posted a tweet that included the hashtag #WillSpeakSoon.

39.     On July 2, 2020, Mr. Cohen took to Twitter to point to a favorable ruling allowing the publication of a different book critical of President Trump to proceed. He also tweeted that "I am close to completion of my book…anticipated release date will be late September".



**D.      Mr. Cohen Is Remanded Into Custody For His Desire to Publish Imminently**

40.     On July 9, 2020, Mr. Cohen, accompanied by his attorney Jeffrey K. Levine, reported to the U.S. Probation Office in downtown Manhattan in order to transition from furlough to home confinement.  Once there, Mr. Cohen and Mr. Levine met with Probation Officer Adam Pakula and Supervisory U.S. Probation Officer Enid Febus.

41.     Messrs. Cohen and Levine were handed a Federal Location Monitoring Program Participant Agreement (the "FLM Agreement"). The first paragraph (the "Prior Restraint Provision") caught their attention. It read as follows:

> 1)     No engagement of any kind with the media, including print, tv, film, books, or any other form of media/news.  Prohibition from all social media platforms.  No posting on social media and a requirement that you communicate with friends and family to exercise discretion in not posting on your behalf or posting any information about you. The purpose is to avoid glamorizing or bringing publicity to your status as a sentenced inmate serving a custodial term in the community.

42.     On information and belief, the FLM Agreement—including the Prior Restraint Provision—had been custom-made for Mr. Cohen. The document bore no legend indicating that it was a standard government-issued form and was riddled with typographical errors and irregularities.

43.     Messrs. Cohen and Levine asked if the FLM Agreement—and, in particular, its Prior Restraint Provision—as standard, and Mr. Cohen commented that it did not appear to be. Mr. Cohen also commented that the Prior Restraint Provision would prevent him from completing and publishing the book that he was working on.

44.     Messrs. Cohen and Levine also stated that they did not understand the conditions with respect to the restrictions placed on Mr. Cohen's family and friends. Mr. Levine expressed concern that, while Mr. Cohen could relay this condition to his family and friends, it was unclear how Mr. Cohen could ensure that his family and friends would comply with it. He noted his concern that Mr. Cohen could then be viewed as violating his conditions due to conduct over which he had no control.

45.     Given the chilling effect the Prior Restraint Provision would have on every aspect of Mr. Cohen's speech, Mr. Levine asked the Probation Officers if it would be possible to adjust the broad language to better conform to the stated rationale in the last sentence of the paragraph;

namely, that the FLM was intended to "avoid glamorizing or bringing publicity to [Mr. Cohen's] status as a sentenced inmate serving a custodial term in the community."

46.     Ultimately, the Probation Officers suggested tabling this issue and proceeding to review the remaining seven paragraphs. They stated that they would then send Mr. Levine's inquiry regarding the language of the Prior Restraint Provision "up the chain of command" for a decision.

47.     Mr. Levine asked certain other clarifying questions, such as how much advance notice was required for medical appointments. Mr. Cohen expressed that he wanted to be certain that he understood all of the terms so that he would not inadvertently violate any rules, and he stated that he had the utmost respect for the Probation Officers, as for everyone in the courthouse.

48.     At no time did Mr. Cohen refuse to sign the FLM Agreement.

49.     At no time did Mr. Cohen refuse electronic monitoring, or any other condition of home confinement.

50.     The Probation Officers asked Messrs. Cohen and Levine to sit in a waiting area while they discussed the FLM Agreement, and the Prior Restraint Provision in particular, with their higher-ups. Mr. Cohen complied and waited, along with Mr. Levine, for approximately one and a half hours.

51.     Given the amount of time that had passed, Mr. Levine knocked on the door and asked if everything was alright.  Probation Officer Pakula assured him that they were just awaiting a response from their chain of command.

52.     Mr. Cohen was never presented with the FLM Agreement for execution. Instead, three United States Marshals arrived with handcuffs and shackles and placed them on Mr. Cohen in order to remand him back to prison.

53.     Levine was presented with an "RRC Failure" report signed by BOP Residential

Reentry Manager Patrick McFarland, which falsely stated that Mr. Cohen had "failed to agree to

the terms of Federal Location Monitoring" and was being remanded for that reason.

54.     Mr. Levine explained that this was in error, as Mr. Cohen had not failed to agree to

the terms, and that the parties simply had not yet finished the meeting. The Probation Officers did

not deny this, but instead said it was "out of [their] hands" and was an order from within the BOP.

The "RRC Failure" report provided to Mr. Levine was as follows:



55.     Mr. Cohen repeatedly stated that he was willing to sign the FLM. He was denied

that opportunity and was led away in shackles.

56.     Rather than being released to home confinement to serve the remainder of his

sentence, Mr. Cohen was confined in a cell at the Metropolitan Correctional Center.

57.     The U.S. Marshals thereafter transported Mr. Cohen to Otisville, where he was placed in the Special Housing Unit.  He was then transferred to solitary confinement where he remains to this day.

58.     Upon his return to Otisville, staff there, including Camp Administrator Robert Schreffler, repeatedly informed Mr. Cohen that the decision to remand him had not been made at the facility level but rather at higher levels.

**E.     The BOP's Pretextual Explanations for its Conduct Are False**

59.     The BOP took the unusual step of issuing a public statement on July 9, 2020 regarding Mr. Cohen's extraordinary remand. As reported by a number of news outlets, Emery Nelson, a BOP spokesperson, asserted that Mr. Cohen was taken into custody for having "declined to agree to the terms of his home confinement." The BOP went on to say that: "As a federal inmate, Mr. Cohen remains subject to compliance with BOP policy, which includes being subject to electronic monitoring and obtaining pre-approval for media interviews" and that "as a result of his refusal to consent to the terms of the program, he was returned to a BOP facility for service of his sentence."

60.     On July 15, 2020, the BOP issued a second public statement regarding Mr. Cohen's remand in response to an inquiry by a media outlet.  The BOP stated that: "[A]s a federal inmate, Mr. Cohen remains subject to compliance with BOP policy, which includes agreement to electronic monitoring and obtaining pre-approval for media interviews.  He declined to agree with all of the terms of the FLM program, most notably electronic monitoring, and as a result, he was returned to a BOP facility for service of his sentence."

61.     These statements by the BOP regarding Mr. Cohen's actions were false.

62.     Mr. Cohen did not refuse to sign the FLM.  To the contrary, Mr. Cohen was eager to be placed on home confinement because the alternative—return to Otisville—would endanger his health. Indeed, as he was being handcuffed, he pleaded to be permitted to sign the FLM Agreement in order to avoid being remanded. He was never presented with the final FLM Agreement to sign—not the original Agreement with the Prior Restraint Provision, nor any modified version.

63.     The BOP's statements also falsely described the proposed FLM agreement. The Prior Restraint Provision was not a requirement that Mr. Cohen merely seek "pre-approval" for media interviews—rather, it was an absolute prohibition on his ability to speak publicly. The Prior Restrain Provision is not reasonably related to any legitimate penological purposes.

64.     Further, the BOP's suggestion that Mr. Cohen refused electronic monitoring was false. Mr. Cohen always understood that home confinement included electronic monitoring. He never objected to electronic monitoring, much less refused it.

**F.     Mr. Cohen Remains in Solitary Confinement, at Great Risk to His Health and Well-Being**

65.     For some 23.5 hours every day, Mr. Cohen lives alone in a 12 by 8 foot cell. On weekends, Mr. Cohen is only permitted to leave his cell for 30 minutes over the course of 72 hours.

66.     Mr. Cohen's COVID-19 risk factors that dictated his release in the first instance have not changed, nor is it possible that the BOP could have changed its determination about that risk. Prisons and jails continue to be concerning hotspots for the spread of COVID-19 in a pandemic that has not abated.

67.     Mr. Cohen has suffered tremendously while in solitary confinement. His blood pressure has spiked to critical levels, leading to severe headaches, shortness of breath and anxiety.

68.     Since being remanded to prison, Mr. Cohen has not made any progress on his book. In any event, Mr. Cohen would be concerned about resuming work on his book while in custody, fearing further retaliation by the BOP in light of its abrupt recission of his release to home confinement.

**G.     Retaliation for Mr. Cohen's Book**

69.     The government's effort to exercise prior restraint over Mr. Cohen's book is only the latest in the Trump Administration's efforts to censor speech that reflects negatively on Trump himself or his Administration.

70.     On June 16, 2020, the Civil Division of the U.S. Department of Justice, under the leadership of Respondent Barr, brought a lawsuit against former National Security Advisor John Bolton to block the publication of his book, *The Room Where It Happened*. Shortly after filing the lawsuit against Mr. Bolton, the Department of Justice filed an emergency motion seeking a temporary restraining order to stop the publication of Mr. Bolton's book. The court denied the motion and refused to block the book's publication. Mr. Bolton's book was published on June 23, 2020 and has been the subject of significant public discussion.

71.     On June 26, 2020, Mr. Trump's brother (through the same attorney who had sent a cease-and-desist letter to Mr. Cohen, Charles Harder), filed a lawsuit in New York State Supreme Court seeking to block the publication of Mary Trump's forthcoming book, *Too Much and Never Enough*, which promised to share embarrassing details of the author's experience and observations relating to Mr. Trump, her uncle. The court allowed Ms. Trump's publisher to go forward with publishing Ms. Trump's book as scheduled on July 14, 2020. On July 13, the legal challenge against Mary Trump also was dismissed, allowing her to proceed with the publication of her book.

Ms. Trump's book was published on July 14, 2020 and has been the subject of significant public discussion.

72.     This also was not the first attempt to stop publication of Mr. Cohen's book specifically. Indeed, on April 30, 2020, Trump Organization attorney Charles Harder sent a cease and desist letter to Mr. Cohen's attorney, claiming that Mr. Cohen was barred by a Non-Disclosure Agreement ("NDA") from publishing his book. Mr. Cohen believes that he never signed such an NDA. Though Mr. Harder purported to attach the NDA to the letter, no NDA was in fact attached. Even after Mr. Cohen's attorney followed up to request that Mr. Harder send the purported NDA, he failed to do so.

**H.     This Court Has Authority to Order Plaintiff's Release to Home Confinement**

73.     Petitioner challenges the fact of his detention in violation of the First Amendment and seeks immediate release to home confinement, under conditions the Court deems proper.

74.     The writ of habeas corpus under 28 U.S.C. § 2241 is an appropriate vehicle for granting this relief. Section 2241 authorizes courts to grant habeas corpus relief where, *inter alia*, a person "is in custody in violation of the Constitution . . . of the United States," 28 U.S.C. § 2241(c)(3).

75.     In addition, courts have broad power to fashion equitable remedies to address constitutional violations in prisons. *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978); see also *Bing v. Roadway Exp., Inc*., 485 F.2d 441, 448 (5th Cir. 1973) ("We must remember that the power of the district court to fashion an equitable remedy is broad."). "When necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

## CLAIM FOR RELIEF

### Violation of the First Amendment
### (Retaliation for Exercise of Freedom of Speech Rights)

76.    The First Amendment guarantees Petitioner the right to freedom of speech.

77.    Petitioner engaged in speech protected by the First Amendment when he drafted a book manuscript for publication. The manuscript, which details Petitioner's work for the President, constitutes speech on a matter of public concern. The manuscript also expresses a viewpoint that is critical of the President and of the federal government.

78.    Petitioner's June 26, 2020 and July 2, 2020 announcements that publication is imminent and intended to occur before the upcoming presidential election are equally protected by the First Amendment, as is his desire to publish his book on that timeline.

79.    Respondents violated Petitioner's right to freedom of speech by remanding him to prison in retaliation for his protected speech, including his plans to continue drafting and to eventually publish his book manuscript.

80.    Respondents violated Petitioner's right to freedom of speech by placing him in solitary confinement in retaliation for his protected speech, including his plans to continue drafting and to eventually publish his book manuscript.

81.    Respondents' actions in remanding Petitioner to prison, and in placing him in solitary confinement, constitute adverse action against Petitioner.

82.    Respondents' actions were caused by Petitioner's exercise of his First Amendment rights, including his stated intention to publish a book critical of Mr. Trump before the election.

83.    Respondents' retaliatory actions against Petitioner would chill a person of ordinary firmness from exercising their First Amendment rights. Petitioner himself has been chilled from

further exercising his First Amendment rights out of fear that Respondents will continue to retaliate against him.

84.     Petitioner has suffered, and continues to suffer, irreparable injury as a result of Respondents' actions and is entitled to injunctive relief to avoid further injury.

<b>PRAYER FOR RELIEF</b>

WHEREFORE Petitioner requests that the Court grant the following relief:

i.      Issue a temporary restraining order and preliminary and permanent injunctive relief ordering Respondents to immediately release Petitioner to home confinement under conditions the Court deems proper;

ii.     Award Petitioner his costs and reasonable attorneys' fees in this action, including costs and fees recoverable under 28 U.S.C. § 2412, the Equal Access to Justice Act, and other applicable law; and

iii.    Grant any other and further relief that this Court may deem fit and proper.


Dated: July 20, 2020                             Respectfully submitted,
       New York, New York

                                                 /s/ *E. Danya Perry*
                                                 E. Danya Perry
                                                 Samidh Guha
                                                 George M. Barchini
                                                 PERRY GUHA LLP
                                                 35 East 62nd Street
                                                 New York, New York 10065
                                                 Telephone: (212) 399-8330
                                                 Facsimile: (212) 399-8331
                                                 Email: dperry@perryguha.com
                                                 Email: sguha@perryguha.com
                                                 Email: gbarchini@perryguha.com

                                                 Vera Eidelman*
                                                 Arianna Demas

18

Brian Hauss
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 549-2500
Email: veidelman@aclu.org
Email: ademas@aclu.org
Email: bhauss@aclu.org

*Attorneys for Petitioner Michael D. Cohen*

*\* Pro hac vice application forthcoming*

## <u>VERIFICATION PURSUANT TO 28 U.S.C. § 2242</u>

I am submitting this verification on behalf of Mr. Cohen as one of Mr. Cohen's attorneys. I have discussed with Mr. Cohen the events described in this Petition and have examined all documents referenced herein. On the basis of those discussions and upon my review of those documents, on information and belief, I hereby verify that the factual statements made in the attached Verified Writ of Habeas Corpus under 28 U.S.C. § 2241 are true and correct to the best of my knowledge.


Dated: July 20, 2020                               /s/ *E. Danya Perry*
      New York, New York                    E. Danya Perry
                                          *Attorney for Petitioner*

## <u>CERTIFICATE OF SERVICE</u>

I, E. Danya Perry, certify that on July 20, 2020, I caused the foregoing Verified Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241 to be filed with the Clerk of the Court and served upon Respondents' counsel via email and registered mail, in accordance with an agreement between counsel.

/s/ *E. Danya Perry*
E. Danya Perry