# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL D. COHEN,

*Petitioner,*

v.

WILLIAM BARR, in his official capacity as Attorney General of the United States, MICHAEL CARVAJAL, in his official capacity as Director of the Bureau of Prisons, and JAMES PETRUCCI, in his official capacity as Warden of the Federal Correctional Institution, Otisville,

*Respondents.*

No. 20 Civ. 5614

---

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER

E. Danya Perry
Samidh Guha
George M. Barchini
PERRY GUHA LLP
35 East 62nd Street
New York, New York 10065
Telephone: (212) 399-8330

Vera Eidelman*
Arianna Demas
Brian Hauss
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 549-2500

*Attorneys for Petitioner Michael Cohen*

* *Pro hac vice* application forthcoming

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     FACTUAL BACKGROUND .................................................................................... 2

        A.      Mr. Cohen's Book ......................................................................................... 2

        B.      Mr. Cohen is Released From FCI Otisville Due to His
                Vulnerability to COVID-19 ........................................................................... 4

        C.      Mr. Cohen Announces Plans to Publish His Book Imminently ............................ 5

        D.      Mr. Cohen Is Remanded Into Custody For Questioning a Surprise
                Gag Order ...................................................................................................... 6

        E.      The BOP's Explanations for its Conduct Are False .............................................. 10

        F.      Mr. Cohen Remains in Solitary Confinement, at Great Risk to His
                Health and Well-Being .................................................................................. 11

        G.      Past Attempts to Stop the Publication of Anti-Trump Books ............................. 12

        A.      Petitioner is Likely to Succeed on the Merits of His Claim ................................. 13

                1.      The First Amendment Protects Drafting a Book for
                        Publication ........................................................................................ 13

                2.      Remanding Petitioner to Prison and Placing Him in Solitary
                        Confinement Constitute Adverse Actions ................................................. 16

                3.      Petitioner's Protected Speech Led to Respondents' Adverse
                        Action ............................................................................................... 17

        B.      Petitioner Will Suffer Irreparable Harm Absent the Requested
                Relief ............................................................................................................ 20

        C.      The Balance of Equities is in Petitioner's Favor, and the Public
                Interest Supports Injunctive Relief .................................................................. 22

III.    CONCLUSION ...................................................................................................... 23

# TABLE OF AUTHORITIES

## Cases

*Abu-Jamal v. Price*,
  154 F.3d 128 (3d Cir. 1998)......................................................................................15

*Asherman v. Meachum*,
  957 F.2d 978 (2d Cir. 1992)......................................................................................16

*Basank v. Decker*,
  No. 20 Civ. 2518 (AT), 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) ..................21

*Branzburg v. Hayes*,
  408 U.S. 665 (1972)..................................................................................................13

*Burns v. Martuscello*,
  890 F.3d 77 (2d Cir. 2018)...........................................................................14, 16, 17

*Butler v. Westchester County,*
  No. 94 Civ. 8216 (SHS), 2000 WL 335539 (S.D.N.Y. Mar. 30, 2000) ..................16

*Conn. Dep't of Envtl. Prot. v. OSHA*,
  356 F.3d 226 (2d Cir. 2004)......................................................................................20

*Coronel v. Decker*,
  No. 20 Civ. 2472 (AJN), 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) ...........21, 22

*Davis v. Goord*,
  320 F.3d 346 (2d Cir. 2003)................................................................................17, 19

*Davis v. Kelly*,
  160 F.3d 917 (2d Cir. 1998)......................................................................................16

*Deeper Life Christian Fellowship, Inc. v. Bd. of Educ.*,
  852 F.2d 676 (2d Cir.1988).......................................................................................21

*Elrod v. Burns*,
  427 U.S. 347 (1976)............................................................................................14, 16

*Espinal v. Goord*,
  558 F.3d 119 (2d Cir. 2009)................................................................................13, 19

*Faiveley Transport Malmo AB v. Wabtec Corp.*,
  559 F.3d 110 (2d Cir. 2009)......................................................................................20

*Fermin-Rodriguez v. Westchester Cty. Jail Med. Pers.*,
    191 F. Supp. 2d 358 (S.D.N.Y. 2002), *as amended* (Mar. 25, 2002) .....................................16

*Garrison v. Louisiana*,
    379 U.S. 64 (1964).......................................................................................................14

*Gill v. Pidlypchak*,
    389 F.3d 379 (2d Cir. 2004)........................................................................................16

*Helling v. McKinney*,
    509 U.S. 25 (1993).......................................................................................................21

*Jordan v. Pugh*,
    504 F. Supp. 2d 1109 (D. Colo. 2007).......................................................................15

*L.V.M. v. Lloyd*,
    318 F. Supp. 3d 601 (S.D.N.Y. 2018).........................................................................22

*Meriwether v. Coughlin*,
    879 F.2d 1037 (2d Cir. 1989).......................................................................................16

*Mitchell v. Cuomo*,
    748 F.2d 804 (2d Cir. 1984).........................................................................................20

*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976)................................................................................................13, 14

*New York Times Co. v. Sullivan*,
    376 U.S. 254 ................................................................................................................14

*Owen v. Lash*,
    682 F.2d 648 (7th Cir. 1982) ......................................................................................15

*Ragbir v. Homan*,
    923 F.3d 53 (2d. Cir. 2019)....................................................................................15, 19

*Schneider v. State of New Jersey, Town of Irvington*,
    308 U.S. 147 (1939).....................................................................................................13

*Scott v. Coughlin*,
    344 F.3d 282 (2d Cir. 2003).........................................................................................16

*Shaheen v. Filion*,
    No. 9:04 Civ. 625 (FJS/DRH), 2006 WL 2792739 (N.D.N.Y. Sept. 17, 2006).....................14

*Smith v. People of the State of California*,
   361 U.S. 147 (1959)........................................................................................13

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)..........................................................................................12

**Rules & Statutes**

CARES Act........................................................................................................21

Fed. R. Civ. P. 65..............................................................................................1

U.S. Const. amend. I...............................................................................*passim*

U.S. Const. amend. V.......................................................................................16

28 U.S.C. § 2241...............................................................................................1

**Other Authorities**

Sawyer, Kathleen Hawk, *Program Statement No. 1480.05 (News Media
   Contacts)*, Bureau of Prisons (Sept. 21. 2000),
   https://www.bop.gov/policy/progstat/1480_005.pdf ...............................18

Sawyer, Kathleen Hawk, *Program Statement No. 5350.27 (Inmate Manuscripts)*,
   Bureau of Prisons (July 27, 1999),
   https://www.bop.gov/policy/progstat/5350_027.pdf ....................3, 15, 18

Petitioner Michael D. Cohen respectfully submits this memorandum of law in support of his motion, pursuant to 28 U.S.C. § 2241 *et seq.* and Federal Rule of Civil Procedure 65, for a temporary restraining order and a preliminary injunction ordering Respondents to immediately release him.

## PRELIMINARY STATEMENT

Michael Cohen is currently imprisoned in solitary confinement because he is drafting a book manuscript that is critical of the President of the United States—and because he recently made public that he intends to publish this book shortly before the upcoming election.

For more than a decade, Mr. Cohen was President Trump's personal lawyer. He has announced that, in the run-up to the 2020 presidential election, he will tell the American people about his experiences working for Mr. Trump, including previously unknown anecdotes and details about Mr. Trump's bad behavior behind closed doors. Mr. Cohen has been drafting the book since the time of his incarceration at FCI Otisville in May 2019, after pleading guilty to two sets of criminal charges related in part to his work for Mr. Trump.

In April of this year, with COVID-19 ravaging the country, the Bureau of Prisons ("BOP") determined that Mr. Cohen must be released from prison because he suffers from high co-morbidity risk factors—including severe hypertension and respiratory issues—that place him at risk of serious illness or death should he contract COVID-19. Pursuant to a BOP policy mandated by Act of Congress, the BOP released Mr. Cohen on furlough in May 2020. Under the BOP's determination, following furlough, Mr. Cohen was to be transitioned into home confinement for the duration of his term of imprisonment.

While he was on furlough, Mr. Cohen publicly announced that he was putting the finishing touches on a tell-all book about his decade-long experience with President Trump. Just one week

later, on July 9, 2020, BOP officers under the direction of Respondents presented Mr. Cohen with an unconstitutional demand: As a condition of his release—a release BOP already had determined was necessary for his health and safety—Mr. Cohen had to agree to a complete bar on speaking to or through any media of any sort.

Mr. Cohen expressed that this condition would bar him from making any progress on his book draft, making a pre-election publication date unlikely. But, because he was fearful for his life should he be remanded to prison, he did not refuse. Instead, he and his lawyer sought both to clarify the meaning of the condition, and to tailor it more narrowly to the BOP's stated reason for including it; namely, to avoid glamorizing or bringing attention to his upcoming home confinement status. BOP officials refused those requests. Instead, they remanded him into solitary confinement in Respondents' custody, where he remains.

This is not a motion about politics or personalities—this is a request to prevent a plain violation of the Constitution. The First Amendment forbids Respondents from imprisoning Mr. Cohen as punishment for drafting a book that is critical of the President, and for preparing to publish it shortly before the upcoming election. He turns to this Court for relief.

## FACTUAL BACKGROUND

### A.    Mr. Cohen's Book

Mr. Cohen is close to finishing a book about President Trump that describes his first-hand experiences as Mr. Trump's lawyer and personal adviser for close to a decade, first at the Trump Organization, then as part of the 2016 Trump Presidential Campaign, and finally once Mr. Trump became President. *See* Verified Pet. for Writ of Habeas Corpus under 28 U.S.C. § 2241 (ECF No. 1) ("Ver. Pet.") ¶ 16; Decl. Of Michael D. Cohen ("Cohen Decl.") ¶¶ 3, 9. The manuscript provides graphic and unflattering detail about the President's behavior behind closed doors. Cohen Decl. ¶

5. It relies upon and includes numerous previously unknown anecdotes, supported by documentary evidence. *Id.* Mr. Cohen's book will thus bear on matters of significant public interest. Ver. Pet. ¶ 18. As Mr. Cohen publicly announced on June 26, 2020 and July 2, 2020—and also communicated directly to Respondents' agents on July 9, 2020—he plans to publish the book in September 2020, shortly before the upcoming election. Cohen Decl. ¶¶ 9, 20.

Mr. Cohen has stated—including through public testimony before Congress—that the book will be truthful but unfavorable to President Trump and his administration. Ver. Pet. ¶ 20; Cohen Decl. ¶¶ 4, 5. The fact that Mr. Cohen is critical of President Trump is well known, in part because he shared some of his negative opinions of President Trump during his congressional testimony. Ver. Pet. ¶ 20.

Mr. Cohen has been working on his manuscript since shortly after he was imprisoned at FCI Otisville (which is located within the Southern District of New York). Cohen Decl. ¶ 4. He was incarcerated there after he pled guilty to two sets of criminal charges, related in part to his work for Mr. Trump, and voluntarily surrendered to custody in May 2019. Ver. Pet. ¶ 17; Cohen Decl. ¶¶ 1, 3. While housed in the general population at the FCI Otisville camp, he was able to write his manuscript consistent with BOP policies. Ver. Pet. ¶¶ 21, 22; Cohen Decl. ¶ 6.

In particular, the BOP has instituted a policy to "encourage inmates to use their leisure time for creative writing and to permit the direct mailing of all manuscripts as ordinary correspondence." *See* Bureau of Prisons, *Program Statement Re: Inmate Manuscripts* (July 27, 1999). The BOP policy provides that "[a]n inmate may prepare a manuscript . . . for publication while in custody without staff approval," and "may mail a manuscript as general correspondence." *Id.* §§ 551.81, 551.82. Ver. Pet. ¶¶ 21, 22.

Mr. Cohen did most of his writing in plain sight, in the law library. Ver. Pet. ¶ 24; Cohen Decl. ¶ 7. Indeed, staff at FCI Otisville explicitly informed Mr. Cohen that they were aware he was writing a book. Ver. Pet. ¶ 24; Cohen Decl. ¶¶ 7, 23.

**B.      Mr. Cohen is Released From FCI Otisville Due to His Vulnerability to COVID-19**

Mr. Cohen originally was scheduled to be released from FCI Otisville after completing his sentence on November 22, 2021. Ver. Pet. ¶ 25. This changed with the onset of the COVID-19 public health crisis in early 2020. *Id.* COVID-19, the sickness caused by the novel coronavirus SARS-CoV-2, is easily transmissible in the close quarters of federal prisons, threatening the life and health of inmates and staff alike. *Id.* ¶ 26. Mr. Cohen is at high risk of severe and life-threatening consequences if he contracts COVID-19 because he suffers from severe hypertension and has a history of respiratory compromise. Ver. Pet. ¶ 28; Cohen Decl. ¶ 11. While at FCI Otisville, Mr. Cohen twice required emergency medical treatment in February 2020 alone. *Id.*

To help protect prisoners and staff from the spread of COVID-19, Congress authorized expanded home incarceration for federal prisoners under the CARES Act. Ver. Pet. ¶ 27. Pursuant to the CARES Act, Respondent Barr issued a memorandum on March 26, 2020 directing the BOP to evaluate prisoners for release based on their health risks. *Id.* At FCI Otisville, staff directed prisoners to submit what is known within the BOP as a BP-8 form, which allowed each prisoner to articulate the basis for his application to be released to home confinement in light of the COVID-19 pandemic. Ver. Pet. ¶ 29; Cohen Decl. ¶ 10.

On March 31, 2020, Mr. Cohen submitted his BP-8 form, requesting that he be transferred to home confinement due to his medical history. Ver. Pet. ¶ 29; Cohen Decl. ¶ 11. Mr. Cohen provided Respondents with medical records to demonstrate his need for release. Ver. Pet. ¶ 29; Cohen Decl. ¶ 19; Declaration of Jeffrey K. Levine ("Levine Decl.") ¶ 3. After assessing his

medical conditions and COVID-19 co-morbidity factors, the BOP determined that Mr. Cohen should be released on furlough and then transferred to home confinement due to his medical vulnerabilities. Ver. Pet. ¶ 30; Cohen Decl. ¶¶ 12-13; Levine Decl. ¶ 4.

On or about May 21, 2020—after a period of solitary confinement purportedly meant to quarantine Mr. Cohen before his release, but which lasted far beyond the 14-day quarantine period—Mr. Cohen was released pursuant to a Furlough Approval, dated May 21, 2020. Ver. Pet. ¶ 32; Cohen Decl. ¶ 18; Levine Decl. ¶ 5. While on furlough, Mr. Cohen complied diligently with the terms of his Furlough Approval and with the oral instructions and guidance of the FCI Otisville personnel. Ver. Pet. ¶ 34; Cohen Decl. ¶ 19. Mr. Cohen also filled his time, as he had at FCI Otisville prior to his detention in solitary confinement, by writing and editing his book. Ver. Pet. ¶ 34; Cohen Decl. ¶ 20.

On or about June 19, 2020, approximately thirty days after Mr. Cohen's delayed release on furlough, but after the May 31, 2020 expiration of the initial Furlough Approval, the BOP had not yet completed the steps required to transition Mr. Cohen to home confinement. Ver. Pet. ¶ 36. The BOP voiced no concern about Mr. Cohen's compliance and extended the Furlough Approval. *Id.*

## C.  Mr. Cohen Announces Plans to Publish His Book Imminently

From the time of his release on furlough on May 21, 2020, Mr. Cohen repeatedly stated publicly that he was writing a book, and that he intended to publish it soon. Ver. Pet. ¶ 37; Cohen Decl. ¶ 9. On June 26, 2020, he posted a tweet that included the hashtag #WillSpeakSoon. Ver. Pet. ¶ 38; Cohen Decl. ¶ 9. On July 2, 2020, Mr. Cohen took to Twitter to express his support for a favorable ruling in the New York state court case allowing the publication of Mary Trump's forthcoming book, *Too Much and Never Enough*, which promised to share embarrassing details of the author's experience and observations relating to Mr. Trump, her uncle. Ver. Pet. ¶ 71. Mr.

Cohen announced that he was "close to completion of [his] book…anticipated release date will be late September." *Id.* Ver. Pet. ¶ 39; Cohen Decl. ¶ 9.

### D.    Mr. Cohen Is Remanded Into Custody For Questioning a Surprise Gag Order

On July 9, 2020, Mr. Cohen, accompanied by his attorney, Jeffrey K. Levine, reported to the United States Probation Office ("USPO") in downtown Manhattan as requested by the USPO in order to transition from furlough to home confinement. Ver. Pet. ¶ 40; Cohen Decl. ¶ 30; Levine Decl. ¶ 13. Mr. Cohen and Mr. Levine met with Probation Officer Adam Pakula and Supervisory U.S. Probation Officer Enid Febus, who handed them a Federal Location Monitoring Program Participant Agreement (the "FLM Agreement") that had eight numbered paragraphs. Ver. Pet. ¶¶ 40-41;  Levine Decl, ¶ 14, Ex. B.

The first numbered paragraph (the "Prior Restraint Provision") read as follows:

> 1)      No engagement of any kind with the media, including print, tv, film, books, or any other form of media/news.  Prohibition from all social media platforms.  No posting on social media and a requirement that you communicate with friends and family to exercise discretion in not posting on your behalf or posting any information about you. The purpose is to avoid glamorizing or bringing publicity to your status as a sentenced inmate serving a custodial term in the community.

Ver. Pet. ¶¶ 40-41;  Levine Decl, ¶ 15, Ex. B.

The FLM Agreement—including the Prior Restraint Provision—appeared to have been custom-made for Mr. Cohen. Ver. Pet. ¶ 42; Cohen Decl. ¶ 33; Levine Decl. ¶ 16. The document bore no legend indicating that it was a standard government-issued form and was riddled with typographical errors and irregularities. Ver. Pet. ¶ 42; Levine Decl, ¶ 15, Ex. B.

Mr. Cohen commented that the Prior Restraint Provision would prevent him from completing and publishing the book that he was working on. Ver. Pet. ¶ 43; Cohen Decl. ¶¶ 33-35; Levine Decl. ¶ 17. Messrs. Cohen and Levine also stated that they did not understand the conditions with respect to the restrictions placed on Mr. Cohen's family and friends. Ver. Pet. ¶ 44; Cohen Decl. ¶¶ 33-35; Levine Decl. ¶ 17 Mr. Levine expressed that, while Mr. Cohen could

relay this condition to his family and friends, it was unclear how Mr. Cohen could ensure that his family and friends would comply with it, and he was concerned that Mr. Cohen could then be viewed as violating his conditions due to conduct over which he had no control. *Id.*

Mr. Levine asked the Probation Officers if it would be possible to adjust the broad language to better conform to the stated rationale in the Prior Restraint Provision. Ver. Pet. ¶ 45; Cohen Decl. ¶ 35; Levine Decl. ¶ 18. Ultimately, the Probation Officers suggested tabling this issue and proceeding to review the remaining seven provisions of the FLM. Ver. Pet. ¶ 46; Cohen Decl. ¶ 35; Levine Decl. ¶ 18. They stated that they would then send Mr. Levine's inquiry regarding the language of the Prior Restraint Provision "up the chain of command" for a decision. *Id.*

Mr. Cohen expressed that he wanted to be certain that he understood all of the terms so that he would not inadvertently violate any rules, and Mr. Levine asked certain other clarifying questions, such as how much advance notice was required for medical appointments. Ver. Pet. ¶ 47; Levine Decl. ¶ 19. While Mr. Cohen and Mr. Levine inquired about the substance of the provisions, at no time did Mr. Cohen refuse to sign the FLM Agreement. Ver. Pet. ¶ 48; Cohen Decl. ¶ 39; Levine Decl. ¶ 20. Moreover, at no time did Mr. Cohen refuse electronic monitoring, nor any other condition of home confinement. Ver. Pet. ¶ 49; Cohen Decl. ¶ 38; Levine Decl. ¶¶ 21-22.

The Probation Officers invited Messrs. Cohen and Levine to sit in a waiting area while they discussed the FLM Agreement, and the Prior Restraint Provision in particular, with their higher-ups. Ver. Pet. ¶ 50; Cohen Decl. ¶ 38; Levine Decl. ¶ 24. Mr. Cohen complied and waited, along with Mr. Levine, for approximately 1.5 hours. *Id.* Mr. Levine knocked on the door and asked if everything was all right. Ver. Pet. ¶ 51; Cohen Decl. ¶ 40; Levine Decl. ¶ 25. Probation Officer Pakula assured him that they were just waiting for a response from their chain of command. *Id.*

Yet, Mr. Cohen was never presented with the FLM Agreement for execution. Ver. Pet. ¶ 52; Cohen Decl. ¶ 39; Levine Decl. ¶ 24. Instead, three United States Marshals arrived with handcuffs and shackles to place on Mr. Cohen. Ver. Pet. ¶ 52; Cohen Decl. ¶ 41; Levine Decl. ¶ 25. At that time, Mr. Levine was presented with an "RRC Failure" report signed by BOP Residential Reentry Manager Patrick McFarland, which falsely stated that Mr. Cohen had "failed to agree to the terms of Federal Location Monitoring" and was being remanded for that reason. Ver. Pet. ¶ 53; Levine Decl. ¶ 26; Ex. C.

Mr. Levine explained that this was in error, as Mr. Cohen had not failed to agree to the terms, and that the parties simply had not yet finished the meeting. Ver. Pet. ¶ 54; Levine Decl. ¶ 26. The Probation Officers did not deny this, but instead said it was "out of [their] hands" and was an order from within the BOP. *Id.* The "RRC Failure" report provided to Mr. Levine was as follows:

*See image on next page.*

```
                                        UNITED STATES GOVERNMENT MEMORANDUM
                                      RESIDENTIAL REENTRY MANAGEMENT OFFICE
                                                     BROOKLYN, NEW YORK

Date:        July 9, 2020

To:          U.S. MARSHALS SERVICE
             Southern District of New York
                  P. MCFARLAND
From:        Patrick McFarland, Residential Reentry Manager
             Brooklyn, New York 11232

Subject:     RRC FAILURE
Name:        Michael Cohen
Reg. No:     86067-054
CMC: YES     Release Date: 11/22/2021 GCT Release

Location:    US Probation
             500 Pearl Street
             New York, NY 10007

Contact:     Patrick McFarland, RRM
Tel. No:     (718) 840-4218

CIRCUMSTANCES:

  On July 9, 2020, inmate Cohen, Michael 86067-054 failed to agree to the
terms of Federal Location Monitoring for SDNY US Probation.  The BOP is
requesting remand for failure to comply.  We are therefore requesting
his immediate transfer to a secure institution.

As inmate Cohen is a sentenced federal prisoner, I hereby authorize the
United States Marshals Service, Southern District of New York, to remand
her at the Metropolitan Detention Center, Brooklyn, New York pending
further designation.

Your cooperation with this matter is greatly appreciated.

USM-SDNY FAX :(212)637-6131
```

Ver. Pet. ¶ 54; Levine Decl. ¶ 26, Ex. C,

Mr. Cohen repeatedly stated that he was willing to sign the FLM. Ver. Pet. ¶ 55; Cohen Decl. ¶¶ 42-46; Levine Decl. ¶¶ 27-28. He was denied that opportunity and was led away in shackles. *Id.* Rather than being released to home confinement to serve the remainder of his sentence, Mr. Cohen was confined in a cell at the Metropolitan Correctional Center. Ver. Pet. ¶ 56. The U.S. Marshals thereafter transported Mr. Cohen to FCI Otisville, where he was placed in the Special Housing Unit. Ver. Pet. ¶ 57; Cohen Decl. ¶ 48. He was then transferred to solitary confinement, where he remains to this day. Ver. Pet. ¶ 57; Cohen Decl. ¶¶ 48-50. Upon his return to FCI Otisville, staff there, including Mr. Schreffler, repeatedly informed Mr. Cohen that the decision to remand him had not been made at the facility-level but rather at higher levels. Ver. Pet. ¶ 58; Cohen Decl. ¶ 48. ¶ 48.

E.      **The BOP's Explanations for its Conduct Are False**

The BOP took the unusual step of issuing a public statement on July 9, 2020 regarding Mr. Cohen's extraordinary remand. Ver. Pet. ¶ 59. As reported by many news outlets, Emery Nelson, a BOP spokesperson, asserted that Mr. Cohen was taken into custody for having "declined to agree to the terms of" his home confinement. *Id.*; Levine Decl. ¶ 29. The BOP went on to say that: "As a federal inmate, Mr. Cohen remains subject to compliance with BOP policy, which includes being subject to electronic monitoring and obtaining pre-approval for media interviews" and that "[a]s a result of his refusal to consent to the terms of the program, he was returned to a BOP facility for service of his sentence." *Id.*

On July 15, 2020, the BOP issued a second public statement regarding Mr. Cohen's remand in response to an inquiry by a media outlet. Ver. Pet. ¶ 60; Levine Decl. ¶ 30. The BOP stated that: "[A]s a federal inmate, Mr. Cohen remains subject to compliance with BOP policy, which includes agreement to electronic monitoring and obtaining pre-approval for media interviews. He declined to agree with all of the terms of the FLM program, most notably electronic monitoring, and as a result, he was returned to a BOP facility for service of his sentence." *Id.*

These statements by the BOP regarding Mr. Cohen's actions were false. Ver. Pet. ¶ 61. Mr. Cohen did not refuse to sign the FLM. Ver. Pet. ¶ 62; Cohen Decl. ¶¶ 42-46; Levine Decl. ¶ 27. To the contrary, Mr. Cohen was eager to be placed on home confinement because the alternative—returning to FCI Otisville—would endanger his health. *Id.* Indeed, as he was being handcuffed, he pleaded to be permitted to sign the FLM Agreement in order to avoid being remanded. *Id.* He was never presented with the FLM Agreement to sign—whether the original Agreement with the Prior Restraint Provision, or any modified version. Ver. Pet. ¶ 62; Cohen Decl. ¶ 39; Levine Decl. ¶¶ 24-27.

The BOP's statements also falsely described the proposed FLM agreement. Ver. Pet. ¶ 63; The Prior Restraint Provision was not a condition that he merely seek "pre-approval" for media interviews—rather, it was an absolute prohibition on his ability to speak publicly. Ver. Pet. ¶ 63; Cohen Decl. ¶ 32; Levine Decl. ¶ 15 and Ex. B. Further, the BOP's suggestion that Mr. Cohen refused electronic monitoring was false. Mr. Cohen always understood that home confinement included electronic monitoring. He never objected to electronic monitoring, much less refused it. Ver. Pet. ¶ 64; Cohen Decl. ¶ 37.

**F.    Mr. Cohen Remains in Solitary Confinement, at Great Risk to His Health and Well-Being**

For some 23.5 hours every day, Mr. Cohen lives alone in a 12 by 8 foot cell. Ver. Pet. ¶ 65; Cohen Decl. ¶ 49. On weekends, Mr. Cohen is permitted to leave his cell for only 30 minutes over the course of 72 hours. *Id.* As of July 18, 2020, Mr. Cohen has not had access to a computer and has no ability to write or edit his manuscript. Cohen Decl. ¶¶ 50, 53.

Mr. Cohen's COVID-19 risk factors, which dictated his release in the first instance, have not changed, nor has the BOP changed its determination about that risk. Ver. Pet. ¶ 66. Prisons and jails continue to be concerning hotspots for the spread of COVID-19 in a pandemic that has only worsened. *Id.* Mr. Cohen has suffered tremendously while in solitary confinement. Ver. Pet. ¶ 67; Cohen Decl. ¶ 51. His blood pressure has spiked to critical levels, leading to severe headaches, shortness of breath, and anxiety. *Id.*

Mr. Cohen has been unable to continue any meaningful progress on his book, which is in its final stages of completion. Ver. Pet. ¶ 68. Prior to Mr. Cohen's remand, his book was on track for an anticipated September 2020 release date. Progress towards publication has now been impeded due to Mr. Cohen's remand and his fear of further retaliation. Ver. Pet. ¶ 68; Cohen Decl. ¶ 53-55. Mr. Cohen is also uneasy about resuming work on his book while in custody, fearing

further retaliation by the BOP in light of its abrupt recission of his release to home confinement. *Id.*

G.    **Past Attempts to Stop the Publication of Anti-Trump Books**

This is not the Trump Administration's first attempt to stop publication of a book that promises to reveal new information that reflects negatively on the President.

On June 16, 2020, the Civil Division of the U.S. Department of Justice, under the leadership of Respondent Barr, commenced a lawsuit in federal district court in the District of Columbia against former National Security Advisor John Bolton to block the publication of his book, *The Room Where It Happened*. Ver. Pet. ¶ 70. Shortly after the filing of the Bolton lawsuit, the Department of Justice filed an emergency motion seeking a temporary restraining order to stop the publication of Mr. Bolton's book. *Id.* The court denied the motion and refused to block the book's publication. *Id.*

On June 26, 2020, Mr. Trump's brother filed a lawsuit in New York State Supreme Court seeking to block the publication of Mary Trump's book. Ver. Pet. ¶ 71. He was represented by Trump Organization attorney Charles Harder. *Id.* As noted above, that lawsuit also failed to stop publication of a book critical of the President. *Id.* The book came out on July 14, and has since been the subject of significant public discourse. *Id.*

**ARGUMENT**

Movants for a temporary restraining order or for a preliminary injunction must demonstrate that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Yang v. Kosinski*, 960 F.3d 119, 127–28 (2d Cir. 2020).

As set forth below, each element of this test is satisfied here.

**A.     Petitioner is Likely to Succeed on the Merits of His Claim**

Mr. Cohen is likely to succeed on the merits of his claim that Respondents have placed him in prison in retaliation for his protected expression. To succeed on a First Amendment retaliation claim, "a prisoner must show '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the Petitioner, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)). Petitioner is likely to demonstrate each of those elements here.

**1.     The First Amendment Protects Drafting a Book for Publication**

Drafting a book for publication is speech protected by the First Amendment. The First Amendment encompasses the freedoms "to speak, write, print [and] distribute information or opinion," *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 160 (1939), and "the right to publish is central to the First Amendment and basic to the existence of constitutional democracy." *Branzburg v. Hayes*, 408 U.S. 665, 727 (1972). The Supreme Court has long made clear "that the free publication and dissemination of books and other forms of the printed word" are First Amendment "protected freedoms." *Smith v. People of the State of California*, 361 U.S. 147, 150 (1959). Indeed, the imposition of a prior restraint on publication poses "the most serious and the least tolerable infringement on First Amendment rights[.]" *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

Furthermore, Mr. Cohen's manuscript, which is critical of the President and promises to reveal new information damaging to the President, sits at the zenith of First Amendment protection. The First Amendment reflects our "profound national commitment to the principle that

debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"—including the President. *New York Times Co. v. Sullivan*, 376 U.S. 254, 269(1964). Such speech "is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964).

Mr. Cohen's intent to publish his book imminently is also protected by the First Amendment. "The timeliness of political speech is particularly important." *Elrod v. Burns*, 427 U.S. 347, 373 n.24 (1976) (citing *Carroll v. Princess Anne*, 393 U.S. 175, 182 (1968)). It enables speakers to "bring[ ] news to the public promptly." *Neb. Press*, 427 U.S. at 561. While delays may arise in the typical course of the publication process, "[d]elays imposed by governmental authority are a different matter." *Id.* at 560.

Mr. Cohen has not forfeited all of his First Amendment rights simply because he is in government custody. To the contrary, "[i]nmates clearly retain protections afforded by the First Amendment." *Burns v. Martuscello*, 890 F.3d 77, 86 (2d Cir. 2018) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)). Far from losing all of their rights at the prison gate, prisoners "retain[ ] those First Amendment rights that are not inconsistent with [their] status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.* (quoting *Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004)).

In particular, prisoners retain the right to write and publish a manuscript. The "writing of articles critical of . . . officials" is "clearly [an] assertion[] of [a prisoner's] constitutional rights protected by the First Amendment." *Shaheen v. Filion*, No. 9:04 Civ. 625 (FJS/DRH), 2006 WL 2792739, at *3 (N.D.N.Y. Sept. 17, 2006). A prisoner's "[f]reedom of expression encompasses the publication and dissemination of written materials," and courts have held that BOP attempts to

14

prohibit prisoners from writing for publication "violate[] the First Amendment rights of . . . inmates in federal institutions, and the press." *Jordan v. Pugh*, 504 F. Supp. 2d 1109, 1118, 1126 (D. Colo. 2007) (enjoining BOP rule against prisoners publishing under a byline). Unless a prisoner's publications "amount to fraud, extortion, or threats to those outside the prison, the [government's] valid objectives [in restricting such speech] dwindle." *Abu-Jamal v. Price*, 154 F.3d 128, 134–36 (3d Cir. 1998). *See also Owen v. Lash*, 682 F.2d 648, 650–53 (7th Cir. 1982) (holding that a ban on prisoner correspondence with newspaper reporters violates the First Amendment).

The BOP itself recognizes the importance of guaranteeing prisoners the opportunity to exercise their First Amendment rights. It has instituted policies to "encourage inmates to use their leisure time for creative writing and to permit the direct mailing of all manuscripts as ordinary correspondence." *See* Bureau of Prisons, *Program Statement Re: Inmate Manuscripts* (July 27, 1999). The policy provides that "[a]n inmate may prepare a manuscript . . . for publication while in custody without staff approval," and "may mail a manuscript as general correspondence." *Id.* §§ 551.81, 551.82.

Here, Mr. Cohen drafted a book addressing his work for the President both prior to and after the 2016 election, and announced his plans to publish the book shortly before the upcoming election. Cohen Decl. ¶¶ 4-5, 9. Not only does the book constitute speech on a matter of significant public concern, it is also political speech critical of the incumbent President during an election year. Mr. Cohen's speech therefore lies at "the heart of . . . First Amendment[ ] protection," and "occupies the highest rung of the hierarchy of First Amendment values.'" *Ragbir v. Homan*, 923 F.3d 53, 69 (2d. Cir. 2019) (quoting *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011)). "Indeed, his 'speech critical of the exercise of the State's power lies at the very center of the First Amendment.'" *Id.* (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991)).

2.      **Remanding Petitioner to Prison and Placing Him in Solitary Confinement
Constitute Adverse Actions**

"[A] retaliation claim may lie where an inmate suffers [an] adverse action . . . that would deter a prisoner of ordinary firmness from vindicating his or her constitutional rights[.]" *Burns*, 890 F.3d at 93–94 (quoting *Pidlypchak*, 389 F.3d at 384 ).

Mr. Cohen's remand back to prison for the duration of his sentence constitutes an adverse action, as does his placement into solitary confinement. *See, e.g.*, *Burns*, 890 F.3d at 94 (holding that placement in involuntary protective custody, a more "restricted status," for over six months "more than suffices to show an adverse action"); *Gill*, 389 F.3d at 384 (same for three weeks in keeplock, a more restrictive form of confinement); *Scott v. Coughlin*, 344 F.3d 282, 290 (2d Cir. 2003) (solitary confinement is an adverse action); *cf. Asherman v. Meachum*, 957 F.2d 978, 980 (2d Cir. 1992) (recognizing in context of Fifth Amendment claim that termination of a prisoner's home release constitutes adverse action). This is true even where the government contends that the more restrictive confinement is for the prisoner's own health or safety. *See Burns*, 890 F. 3d at 94.

Equally, Mr. Cohen's re-confinement in prison constitutes adverse action because it was a retaliatory transfer. Although "[p]rison officials have broad discretion to transfer prisoners," "[t]hey may not . . . transfer them solely in retaliation for the exercise of constitutional rights." *Meriwether v. Coughlin*, 879 F.2d 1037, 1045–46 (2d Cir. 1989); *see also Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998) (same). "[I]t is well settled that a transfer may not be made solely in retaliation for the exercise of constitutionally protected rights," *Butler v. Westchester County*, No. 94 Civ. 8216 (SHS), 2000 WL 335539, at *6 (S.D.N.Y. Mar. 30, 2000), and "this Court has the authority to review Petitioner's prison transfer to determine if it was in violation of constitutionally protected rights." *Fermin-Rodriguez v. Westchester Cty. Jail Med. Pers.*, 191 F. Supp. 2d 358, 362 (S.D.N.Y. 2002), *as amended* (Mar. 25, 2002).

Though he need only identify one adverse action to succeed on his claim, Mr. Cohen suffered two adverse actions in this case: first, when he was remanded to prison and, second, when he was placed in solitary confinement. Such treatment would chill a person of ordinary firmness. *See Burns*, 890 F.3d at 93. In fact, Mr. Cohen himself has been chilled from further exercising his First Amendment rights out of fear that Respondents will retaliate against him further. Cohen Decl. ¶ 54 ("Even if I could write while in solitary confinement, I would be deeply concerned about doing so. I am worried about continuing to work on my manuscript, or taking further steps toward publishing it, out of fear that BOP officers will retaliate against me further.").

### 3.     Petitioner's Protected Speech Led to Respondents' Adverse Action

Finally, "[i]n order to satisfy the causation requirement, allegations must be 'sufficient to support the inference that the speech played a substantial part in the adverse action.'" *Davis v. Goord*, 320 F.3d 346, 354 (2d Cir. 2003) (quoting *Dawes*, 239 F.3d at 492). Here, the record strongly suggests that Respondents remanded Mr. Cohen to prison because he recently announced his intention to exercise his First Amendment rights.

While on furlough, Mr. Cohen repeatedly announced his plans to publish his book imminently. On June 26, 2020, he tweeted #WillSpeakSoon. Cohen Decl. ¶ 9. On July 2, 2020, he expressed support for a recent court order denying an attempt to stop the publication of another book that is critical of the President, and specifically noted that his own manuscript was "close to completion." *Id.* Mr. Cohen stated that he anticipated releasing the book in late September, weeks before the upcoming presidential election. *Id.* On July 4, 2020, a BOP official explicitly informed Mr. Cohen that he was aware that Mr. Cohen had been working on a book. Cohen Decl. ¶ 23.

On July 9, 2020, one week after Mr. Cohen's most recent announcement of his intent to publish, Respondents sought to impose a particularly restrictive condition on Mr. Cohen's home

confinement. Cohen Decl. ¶¶ 30-34. The condition would have prohibited him from engaging with any media, including news and books; prohibited him from accessing or posting on any social media platform; and required him to urge family and friends not to post about him on social media. *Id.* ¶ 32; *see also* Levine Decl. Ex. B. The condition was unconstitutionally vague and overbroad, and it would have restricted Mr. Cohen's speech far *more* than the regulations that apply to his speech while he is in prison. Ver. Pet. ¶¶ 21-22; *see also* Bureau of Prisons, *Program Statement Re: Inmate Manuscripts* (July 27, 1999) §§ 551.81, 551.82 ("An inmate may prepare a manuscript . . . for publication while in custody without staff approval," and "may mail a manuscript as general correspondence."); Bureau of Prisons, *Program Statement Re: News Media Contacts* (September 21, 2000) § 540.63 ("[A]n inmate . . . may initiate a request for a person [media] interview at an institution.").

Mr. Cohen immediately stated that this condition would prevent him from publishing his book. Cohen Decl. ¶ 34. Due to this concern, as well as its confusing and overbroad attempt to restrict the speech of Mr. Cohen's family and friends, Mr. Levine asked Respondents if it would be possible to narrow the condition to its stated purpose of "avoid[ing] glamorizing or bringing publicity to [his] status as a sentenced inmate serving a custodial term in the community." Cohen Decl. ¶ 32. In doing so, Mr. Cohen made his desire to publish his book clear. In response, Respondents' agents inquired "up the chain of command" and then informed Mr. Cohen that home confinement was no longer an option, and remanded him to prison. *Id.* ¶¶ 38-43. They then placed him in solitary confinement. *Id.* ¶ 48.

In subsequent public statements, Respondents inaccurately stated that they remanded Mr. Cohen to prison because he "declined to agree to the terms of his home confinement," including "obtaining pre-approval for media interviews." Ver. Pet. ¶ 59. In fact, Mr. Cohen never refused to

agree to the terms, *see* Cohen Decl. ¶ 44, and the terms Respondents presented to him included a blanket prohibition on engaging with the media, *see* Levine Decl. Ex. B, not just a pre-approval requirement. Putting that aside, Respondents' public statements demonstrate that their retaliatory actions against Mr. Cohen were motivated by their disapproval of Mr. Cohen's intent to exercise his First Amendment rights, including Mr. Cohen's right to speak to the media.

The timeline here clearly indicates retaliation. "A Petitioner can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (holding that "passage of only six months" between protected conduct and adverse action sufficed to infer causation). Here, only a week passed between Mr. Cohen's most recent public statement of intent to publish imminently and Respondents' attempt to impose a uniquely harsh condition of confinement on him. Then, almost immediately after Mr. Cohen again informed the BOP, via the Probation Officers, of his plan to publish, the BOP made its decision to remand him to prison and place him in solitary confinement.

The full history also "supports the inference that [Petitioner's intended] speech played a substantial part in the adverse action." *Davis*, 320 F.3d at 354. Respondents "continued a retaliatory course of conduct on Petitioner" by (1) seeking to impose an overbroad and vague speech restriction on Petitioner as a condition of home confinement, (2) taking home confinement off the table as soon as he indicated his continued desire to publish his book, (3) remanding him to prison, and (4) placing him in solitary confinement. *Id.* (finding "continuous courses of retaliatory conduct" sufficient to show an inference of causal relationship).

Even more troublingly, Respondents' adverse action was likely caused by the fact that Mr. Cohen's speech would cast President Trump in a negative light shortly before the presidential

election. "It is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys." *Ragbir*, 923 F.3d at 70 (quoting *Matal v. Tam*, 137 S.Ct. 1744, 1765 (2017). "The Supreme Court has . . . described viewpoint discrimination as a 'blatant' 'violation of the First Amendment.'" *Id.* (quoting *Rosenberger*, 515 U.S. at 829). Respondents' abuse of their authority, in an apparent attempt to prevent publication of a book that promises to reveal negative information about the incumbent president, is textbook viewpoint discrimination.

The Second Circuit's analysis in *Ragbir v. Homan* is directly on point. In that case, a prominent immigration activist filed a *habeas* petition alleging that the federal government sought to remove him from the United States in retaliation for his public criticism of U.S. immigration officials and systems. The court concluded that a "plausible, clear inference is drawn that Ragbir's public expression of his criticism, and its prominence, played a significant role in the recent attempts to remove him" because of statements government officials made about the activist's protected protests. *Id.* at 71. Similarly, here, Respondents were aware of Mr. Cohen's intention to publish a book critical of the President, and they took issue with his desire to exercise his First Amendment rights, including by communicating with the media. Cohen Decl. ¶¶ 7, 22-23.

**B.    Petitioner Will Suffer Irreparable Harm Absent the Requested Relief**

A "showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). A violation of constitutional rights constitutes irreparable harm as a matter of law. *See, e.g., Conn. Dep't of Envtl. Prot. v. OSHA*, 356 F.3d 226, 230–31 (2d Cir. 2004). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984).

In particular, "[the] loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Deeper Life Christian Fellowship, Inc. v. Bd. of Educ.*, 852 F.2d 676, 679 (2d Cir.1988) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Independently, irreparable harm also exists where, as here, petitioners "face imminent risk to their health, safety, and lives." *Coronel v. Decker*, No. 20 Civ. 2472 (AJN), 2020 WL 1487274, at *3 (S.D.N.Y. Mar. 27, 2020). The BOP itself already has found, after a careful assessment of his medical condition and COVID-19 co-morbidity factors, that Mr. Cohen is at serious risk should he remain at FCI Otisville. Accordingly, pursuant to the directives of the CARES Act and Respondent Barr's general instruction and findings related to COVID-19, the BOP made the decision that the BOP and Mr. Cohen would best be served by Mr. Cohen's transfer to home confinement for the remainder of his sentence at home, to ensure his safety. There was no contemplation in either the CARES Act or Respondent Barr's general instruction that a qualifying prisoner instead be transferred indefinitely to solitary confinement, as has happened here.

The pandemic has only worsened since Mr. Cohen's initial release, and subsequent remand, and Mr. Cohen remains at grave risk. It is well-established that risk of exposure to serious health effects alone is sufficient to establish irreparable harm. *See, e.g., Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."). A number of courts already have determined that the risk of harm to detainees from COVID-19 constitutes irreparable harm and injury. *See, e.g., Basank v. Decker,* No. 20 Civ. 2518 (AT), 2020 WL 1481503, at *2 (S.D.N.Y. Mar. 26, 2020).

Mr. Cohen has been attempting to argue his case to the BOP, through counsel and the U.S. Attorney's Office, since July 12, 2020. *See* Declaration of E. Danya Perry ¶¶ 3-8 ("Perry Decl.").

Unfortunately, the BOP has not yet made a determination as to whether or not it will "give Mr. Cohen another opportunity to transfer to home confinement." *Id. ¶ 7*. All the while, Mr. Cohen sits in solitary confinement, in violation of his constitutional rights and in fear for his health. This is the very definition of irreparable harm.

**C.     The Balance of Equities is in Petitioner's Favor, and the Public Interest Supports Injunctive Relief**

"Where the Government is the opposing party, the final two factors in the temporary restraining order analysis—the balance of the equities and the public interest—merge." *Coronel v. Decker*, No. 20 Civ. 2472 (AJN), 2020 WL 1487274, at *7 (S.D.N.Y. Mar. 27, 2020) (citation omitted). These factors weigh strongly in favor of Mr. Cohen.

First, the public interest is "best served by ensuring the constitutional rights of persons within the United States are upheld." *Id.* (quoting *Sajous v. Decker*, No. 18 Civ. 2447 (AJN), 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018)); *see also L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 620 (S.D.N.Y. 2018). Given the strength of Mr. Cohen's claim on the merits of his constitutional claim, the public interest is served by the relief sought.

Furthermore, Respondents' ongoing retaliation against Mr. Cohen threatens to prevent the publication of his book before the upcoming presidential election. Vindication of Mr. Cohen's First Amendment rights not only would reaffirm a bedrock constitutional principle, it also would ensure that the public has a timely opportunity to review the information that Mr. Cohen wishes to share about the incumbent President, particularly in advance of an election.

For the same reasons, the balance of equities clearly tips in Petitioner's favor. Granting Mr. Cohen's release would only restore the course of action that the BOP itself previously has determined to be appropriate, while permitting the BOP to continue to detain Mr. Cohen in solitary confinement endangers Mr. Cohen's health and safety. Further, the BOP cannot plausibly argue

that the requested relief would impose an unreasonable burden on it, given that it already has determined that Mr. Cohen was a suitable candidate for home confinement and released him on furlough.

Mr. Cohen is fearful for his life. He has needlessly and unconstitutionally been remanded to solitary confinement. He is willing to agree to the terms of the FLM Agreement pending the Court's determination of his constitutional claim. Perry Decl. ¶ 3-5. Given that the BOP has stated that it remanded Mr. Cohen for his alleged refusal to agree to the conditions in the FLM agreement, it is impossible to see an argument against his release under these conditions.

## CONCLUSION

For the foregoing reasons, Petitioners' motion for a temporary restraining order should be granted, and Petitioner should be immediately released to home confinement.

Dated: July 20, 2020
      New York, New York

Respectfully submitted,

/s/ *E. Danya Perry*
E. Danya Perry
Samidh Guha
George M. Barchini
PERRY GUHA LLP
35 East 62nd Street
New York, New York 10065
Telephone: (212) 399-8330
Facsimile: (212) 399-8331
Email: dperry@perryguha.com
Email: sguha@perryguha.com
Email: gbarchini@perryguha.com

Vera Eidelman*
Arianna Demas
Brian Hauss
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 549-2500
Email: veidelman@aclu.org
Email: ademas@aclu.org
Email: bhauss@aclu.org

*Attorneys for Petitioner Michael D. Cohen*

* *Pro hac vice* application forthcoming

24

**<u>CERTIFICATE OF SERVICE</u>**

I, E. Danya Perry, certify that on July 20, 2020, I caused the foregoing Memorandum of Law in Support of Petitioner's Emergency Motion for a Temporary Restraining Order to be filed with the Clerk of the Court and served upon counsel via email and the CM/ECF system.

/s/ <i>E. Danya Perry</i>         
E. Danya Perry