UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL D. COHEN,<br><br>        *Petitioner,*<br><br>        v.<br><br>WILLIAM BARR, in his official capacity as Attorney General of the United States, MICHAEL CARVAJAL, in his official capacity as Director of the Bureau of Prisons, and JAMES PETRUCCI, in his official capacity as Warden of the Federal Correctional Institution, Otisville,<br><br>        *Respondents.* | No. 20 Civ. 5614 |

### DECLARATION OF MICHAEL D. COHEN

I, Michael D. Cohen, declare under penalty of perjury and pursuant to 28 U.S.C. § 1746:

1. I am currently being detained in solitary confinement at the Federal Correctional Institution, Otisville ("FCI Otisville"). I am serving a sentence of 36 months imposed on December 12, 2018 in connection with my guilty plea in *United States v. Michael Cohen*, 18 Cr. 602 (S.D.N.Y.) (WHP).

2. I submit this declaration upon personal knowledge in connection with this Verified Petition for Writ of Habeas Corpus. All conversations set forth in this declaration are described in sum and in substance and to the best of my recollection, unless any language appears in quotation marks.

### My Incarceration at the FCI Otisville Camp

3. After the imposition of my sentence, I was designated to FCI Otisville and voluntarily surrendered on May 6, 2019 to begin serving my sentence in the FCI Otisville

1

minimum security camp facility.  I served my sentence there without incident, living and working with other inmates in the general population section of the FCI Otisville camp.  I treasured my family visits, socialized with other inmates, exercised, and participated in FCI Otisville activities and programs.  As far as I am aware, my record has been immaculate.

4. During this time at FCI Otisville, I also began writing a manuscript for my forthcoming book.  Its working title is *Disloyal: The True Story of Michael Cohen, Former Personal Attorney to President Donald J. Trump*.  My book will contain my first-hand experiences and observations based on my decade-long employment and relationship with Mr. Trump and his family, both before and after he was elected President of the United States.  It also will describe my negative experience with the American criminal justice system.

5. In particular, my book will provide graphic and unflattering details about the President's behavior behind closed doors.  For example, the manuscript describes the President's pointedly anti-Semitic remarks and virulently racist remarks against such Black leaders as President Barack Obama and Nelson Mandela, neither of whom he viewed as real leaders or as worthy of respect by virtue of their race.  The book will rely upon and publish numerous personal anecdotes, many of which will be supported by my collection of documentary evidence.

6. It was and continues to be my informed understanding that the Federal Bureau of Prisons ("BOP") rules and regulations allowed me—just as any other inmate—to write this manuscript and coordinate for its eventual publication.

7. I worked openly on my manuscript while detained at FCI Otisville, with the full knowledge of FCI Otisville officials and staff members.  I typically wrote my manuscript in the FCI Otisville library.  I also discussed my book project with FCI Otisville officials, staff members, and certain other inmates.

8.      I was informed by one of my attorneys at the time that, on April 30, 2020, Trump Organization attorney Charles Harder sent a cease and desist letter to me through my attorney, claiming that I am barred by a Non-Disclosure Agreement ("NDA") from publishing my book. Though Mr. Harder purported to attach the NDA to the letter, no NDA was in fact attached. Even after my attorney followed up to request that Mr. Harder send the purported NDA, he failed to do so. I do not believe that I ever signed such an NDA.

9.      Following my release from FCI Otisville, as set forth below, I posted several references to my upcoming book. For example, on June 26, 2020 in response to a *New York Times* article entitled, "Inside Barr's Effort to Undermine N.Y. Prosecutors," I tweeted that "[t]he article reveals only a part of the full story. #WillSpeakSoon #RT." On July 2, 2020, I tweeted that I was "close to completion of my book . . . anticipated release date will be late September."

**My Release on Furlough from FCI Otisville Pursuant to the CARES Act**

10.     In March 2020, FCI Otisville management invited inmates in their custody to submit what is known as a BP-8 form to determine inmates' eligibility for release to home confinement under the newly enacted CARES Act. It is my understanding that the CARES Act was passed by Congress in response to the COVID-19 pandemic and its devastating impact on individuals held in federal correctional facilities.

11.     On March 31, 2020, I submitted my BP-8 form, requesting to be transferred to home confinement due to my medical history and condition. I suffer from severe hypertension and I have a history of respiratory compromise, including bilateral pneumonia and blood clots. It is my understanding that these medical conditions put me at high risk of serious illness or death should I contract COVID-19. While at FCI Otisville, I twice required emergency medical treatment in February 2020.

12. FCI Otisville has many of my medical records from my treatment there, but my attorney and I also provided voluminous additional medical records to demonstrate my need for alternate settings outside of the BOP facilities in which to serve the remainder of my sentence without jeopardizing my health. FCI Otisville thus had, and was further provided with, extensive documentation showing my medical vulnerabilities.

13. On or about April 18, 2020, I was approved for furlough, with an expected release date of May 1, 2020. I was then transferred to solitary confinement in order to quarantine for two weeks prior to my release into the community. After those two weeks, I was informed that my case was being reviewed again by officials higher up at the BOP. Ultimately, I was kept in solitary confinement for thirty-five days. During that time, my blood pressure skyrocketed; I was told by medical personnel on one occasion that my blood pressure was at 195 over 110 or 115, which I am told is at the point of hypertensive crisis.

14. Before my release, BOP informed me that it would ultimately transition me from furlough to home confinement with electronic monitoring for the remainder of my term of incarceration.

15. In preparation for my furlough, I was careful to speak with FCI Otisville Counselor James DeLeo and Camp Administrator Robert Schreffler to inquire as to the parameters of where I was allowed to travel near my home. I was advised that under the terms of my furlough, I was permitted to travel within the five boroughs of New York City, but that it would be best if I remained in Manhattan.

16. I understood from these discussions that I would be subject to electronic monitoring as a part of my home confinement. At no time did I express any hesitation at participating in an

4

electronic monitoring program; very much to the contrary, I was grateful to be provided this alternative.

17. I appreciated the willingness of the FCI officials to communicate with me to answer my questions and provide guidance regarding my upcoming furlough in order to assist my full and complete compliance with the Furlough Approval terms.

18. I was released on May 21, 2020 to my home in New York City on furlough, pursuant to formal BOP authorization (the "Furlough Approval"). I later provided the Furlough Approval to my attorney, Jeffrey K. Levine.

**My Full Compliance with the Terms of the Furlough Approval**

19. I complied with the express terms of the Furlough Approval and with the oral instructions and guidance of the FCI Otisville personnel. Upon returning to my home on May 21, 2020, I dutifully adhered to the conditions of the Furlough Approval, including my weekly telephonic check-in with the BOP.

20. Consistent with the language of the Furlough Approval and the guidance from the FCI Otisville staff, I understood that I was permitted to travel near the "area" of my apartment, which included the five boroughs of New York City. However, in an abundance of caution, I limited my neighborhood outings to short walks within a close radius around my apartment. I also filled my time, as I had at FCI Otisville prior to my transfer to solitary confinement, by writing and editing my forthcoming book. I intended to complete my book for release by September 2020, in advance of the presidential election on November 3, 2020.

21. On July 2, 2020, I was advised that my furlough would be transitioned to home confinement within approximately one week. I understood and agreed that, once my period of

home confinement began, I largely would be relegated to my home, other than for such pre-approved activities as employment or religious services.

22. On July 4, 2020, I received a call from FCI Otisville Camp Administrator Robert Schreffler in response to photographs published in the *New York Post* on the previous day that showed me and my wife dining outdoors with another couple at a restaurant around the corner from my residence. Mr. Schreffler stated that unnamed BOP officials "in Washington" were upset by the *New York Post* piece. Mr. Schreffler explicitly stated that I was permitted to be outside of my apartment. Mr. Schreffler made clear in this call that the upshot was that I had not violated any conditions and that no action would be taken against me. Mr. Schreffler did instruct me that it would be best if I remained at home to avoid any further media scrutiny or further upsetting "Washington." I complied with this instruction.

23. During this July 4th telephone conversation, Mr. Schreffler explicitly informed me that he was aware that I was writing a book, noting that I had previously spent my mornings working on the manuscript in the FCI Otisville library.

24. On or about July 6, 2020, the BOP commenced the process of transitioning me from furlough to home confinement. I was told by BOP officials that my electronic monitoring would be implemented and monitored by a halfway house that contracts with the government, GEO Reentry Services ("GEO").

25. To that end, on or about July 6, 2020, I spoke with an individual named Mr. Gill from GEO, who informed me that he would come to my home for inspection.

26. On July 6, 2020, I also spoke with U.S. Probation Officer Specialist Adam Pakula for the first time. In that conversation, Probation Officer Pakula told me that the United States Probation Office ("USPO") would be coming to my residence on July 9, 2020 to fill out some

paperwork and to install the required location monitoring equipment. During that call, I showed Probation Officer Pakula my apartment via FaceTime to allow him to conduct a home inspection.

27. Later on July 6, 2020, and after my call with Probation Officer Pakula, Mr. Gill arrived at my residence. Mr. Gill conducted a home inspection and then provided me with the name and address for the reporting center in the Bronx that would outfit me with my ankle bracelet. I was at all times compliant with the process for setting up electronic monitoring. Indeed, when Mr. Gill arrived at my apartment and could not find street parking for his vehicle, I asked my son to sit in Mr. Gill's idling car while Mr. Gill conducted his work in our residence. I was anxious to facilitate my transition to home confinement on electronic monitoring, and I simply had no desire or incentive to obstruct Mr. Gill's efforts.

28. After Mr. Gill left, I again spoke with Probation Officer Pakula by phone to clarify whether I was to report to the Bronx GEO location or to expect a home visit from the USPO. Probation Officer Pakula stated that the USPO would be handling my home confinement, and that I should report to the USPO located at 500 Pearl Street in Manhattan at 11:00 am on July 9, 2020 to fill out some paperwork. Probation Officer Pakula stated that, after this meeting, he and others would then return to my residence to install the location monitoring system.

29. I looked forward to the meeting because I hoped to benefit from a discussion with the Probation Officers as to their expectations of me while on home confinement, to ensure that I would be in full compliance. The officials at FCI Otisville and I had such discussions prior to my release on furlough, and I had found them to be helpful in allowing me to successfully navigate the conditions of my Furlough Approval.

**The Probation Office Abruptly Ended Our July 9, 2020
Meeting to Have Me Summarily Remanded to FCI Otisville**

30. On July 9, 2020, Mr. Levine and I reported to the USPO in downtown Manhattan, as instructed. Once there, we met with Probation Officer Pakula and Supervisory U.S. Probation Officer Enid Febus.

31. I was handed a Federal Location Monitoring Agreement (the "FLM Agreement"). The proposed FLM Agreement had eight numbered paragraphs.

32. The first numbered paragraph (the "Prior Restraint Provision") immediately caught my attention. It stated that I could not engage in the following activities:

> No engagement of any kind with the media, including print, tv, film, books, or any other form of media/news. Prohibition from all social media platforms. No posting on social media and a requirement that you communicate with friends and family to exercise discretion in not posting on your behalf or posting any information about you. The purpose is to avoid glamorizing or bringing publicity to your status as a sentenced inmate serving a custodial term in the community.

33. Mr. Levine and I asked the Probation Officers if the FLM Agreement—and, in particular, its Prior Restraint Provision—was standard, and we commented that it did not appear to be.

34. I also noted that the Prior Restraint Provision would prevent me from publishing my book.

35. Mr. Levine asked some questions, including how I would be able to enforce the restriction on my family and friends, and he inquired of the Probation Officers if it were possible to adjust the broad language to better conform to the stated rationale in the last sentence of the Prior Restraint Provision; namely, that the condition was intended to "avoid glamorizing or bringing publicity to [my] status as a sentenced inmate serving a custodial term in the community."

The Probation Officers told us that they would send Mr. Levine's inquiry regarding the language of the Prior Restraint Provision "up the chain of command" for a decision.

36. Mr. Levine also asked the Probation Officers what type of electronic monitoring equipment would be used. The Probation Officers responded that I would be subject to radio frequency monitoring that would be installed at my home immediately following the meeting at the USPO. I expressed agreement. The Probation Officers stated that they would go through the electronic monitoring paperwork with me after they had finished with the FLM Agreement.

37. Mr. Levine and I discussed the remaining provisions of the FLM Agreement with the Probation Officers. Mr. Levine and I asked questions about several of the provisions to be certain that I understood the parameters of my home confinement, much as I had done with the FCI Otisville officials to ensure my understanding of the terms of my Furlough Approval.

38. I was concerned about the Prior Restraint Provision but was fully prepared to execute the FLM Agreement. The Probation Officers invited Mr. Levine and me to sit in a waiting area while they went "up the chain" to discuss the FLM Agreement, and the Prior Restraint Provision in particular. I complied and waited, along with Mr. Levine, for one and a half hours with the full expectation that I would sign the FLM Agreement, or some form of it, upon their return.

39. However, I was never presented with the FLM Agreement for execution.

40. After waiting for some time, Mr. Levine knocked on the door, and the Probation Officers assured Mr. Levine that they were awaiting a response.

41. I was shocked when three U.S. Marshals later arrived with handcuffs and shackles to take me into custody.

42. I did not understand what was happening and repeatedly stated that I would sign the FLM Agreement, as I had planned to do.

43. I have since learned that Mr. Levine was presented with an "RRC Failure" report signed by BOP Residential Reentry Manager Patrick McFarland, which stated that I had "failed to agree to the terms of Federal Location Monitoring" and was being remanded for that reason. This statement is patently false. My understanding is that the BOP has since claimed that I refused electronic monitoring. This, too, is patently false.

44. At no time did I refuse to sign the FLM Agreement.

45. At no time did I refuse electronic monitoring.

46. At no time did I refuse *any* condition of home confinement.

47. Rather than being released to home confinement to serve the remainder of my sentence—as was planned by the BOP and agreed to by me—I was removed by the U.S. Marshals in handcuffs to an adjacent cell at the Metropolitan Correctional Center.

48. FCI Otisville staff took custody of me and transported me to FCI Otisville, where I was placed in the Special Housing Unit and then transferred to solitary confinement. I remain in solitary confinement to this day. Upon my return to FCI Otisville, Mr. Schreffler and other staff repeatedly informed me that the decision to remand me had not been made at the facility-level, but rather at higher levels.

**My Current Incarceration in Solitary Confinement at FCI Otisville**

49. Since shortly after my return to FCI Otisville, I have been relegated for some twenty-three and a half hours in solitary confinement ever weekday, other than for attorney phone calls. I spend the hours alone in a tiny cell that is poorly ventilated and searingly hot, with a broken

window and an incessantly dripping faucet. During the heat wave over the weekend of July 18–19, 2020, the temperature in my cell has soared to nearly unbearable levels.

50. On weekends, I am permitted to leave my cell only for 30 minutes over the course of 72 hours. I am not permitted to exercise, which is contra-indicated given my medical condition. I am not permitted to speak with or see other inmates. Due to COVID-19, I also have no social or legal visits. I have no access to the library or the outside. As of July 19, 2020, I have had no access to commissary and almost no access to social calls.

51. I have suffered terribly while in solitary confinement. Just as during my previous turn in solitary confinement before my furlough, the stress has caused my blood pressure to elevate to dangerous levels. For example, on July 16, 2020, FCI Otisville medical staff took my blood pressure. I was informed that the reading was 166/104, which I understand to be a critical level. These elevated levels cause me severe headaches, shortness of breath, and anxiety.

52. I also am deeply concerned that my speech—which I believe is a matter of significant public concern—will be stifled if I remain under these conditions.

53. As of July 19, 2020, I have not had access to a computer and have not been able to edit my manuscript. Given my hope to communicate my impressions, ideas, and political thoughts through my book in September 2020, in advance of the presidential elections, this time is a critical juncture if I am to complete the book and prepare it for publication and distribution. The combination of not being able to edit or collaborate with my publisher, and not being able to finalize the book for publication, will jeopardize my ability to disseminate my perspectives prior to the 2020 presidential election, and the public's ability to ingest those views.

54. Even if I could write while in solitary confinement, I would be deeply concerned about doing so. I am worried about continuing to work on my manuscript, or taking further steps toward publishing it, out of fear that BOP officers will retaliate against me further.

55. While I continue to believe that the Prior Restraint Provision is an unconstitutional abridgement of my free speech rights, I remain willing to sign the FLM Agreement immediately if that will allow my release from FCI Otisville and my return to home confinement pending negotiation of the specific conditions.

I, E. Danya Perry, an attorney duly admitted to practice in the Southern District of New York, certify that I obtained the statements in this declaration from Michael Cohen by telephone on a number of occasions, including most recently on July 20, 2020. I certify that Mr. Cohen declared under penalty of perjury that all the statements herein were true and correct to the best of his knowledge.

Executed on:  July 20, 2020
              New York, New York

*E. Danya Perry* (signature)

## CERTIFICATE OF SERVICE

I, E. Danya Perry, certify that on July 20, 2020, I caused the foregoing Declaration of Michael D. Cohen to be filed with the Clerk of the Court and served upon Respondents' counsel via email and registered mail, in accordance with an agreement between counsel.

/s/ *E. Danya Perry*
E. Danya Perry