UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL D. COHEN,

    *Petitioner,*

v.

WILLIAM BARR, in his official capacity as Attorney General of the United States, MICHAEL CARVAJAL, in his official capacity as Director of the Bureau of Prisons, and JAMES PETRUCCI, in his official capacity as Warden of the Federal Correctional Institution, Otisville,

    *Respondents.*

No. 20 Civ. 5614

---

## DECLARATION OF JEFFREY K. LEVINE

I, Jeffrey K. Levine, declare under penalty of perjury and pursuant to 28 U.S.C. § 1746:

1. I am an attorney with the Law Offices of Jeffrey K. Levine, with offices located at 340 West 57th Street, New York, New York, 10019.

2. I submit this declaration upon personal knowledge in connection with this Verified Petition for Writ of Habeas Corpus. All conversations set forth in this declaration are described in sum and in substance and to the best of my recollection, unless any language appears in quotation marks.

3. I have served as an attorney for Michael Cohen since the spring of 2020. In this capacity, I have represented Mr. Cohen in connection with his efforts to be released from detention at the Federal Correctional Institution, Otisville ("FCI Otisville") to home confinement, pursuant to the CARES Act. To that end, I assisted Mr. Cohen in collecting and providing voluminous medical records to FCI Otisville and the Federal Bureau of Prisons ("BOP") to assist it in

1

evaluating Mr. Cohen's risk profile for COVID-19. Among the materials provided to FCI Otisville was an affirmation from a physician who had reviewed certain of Mr. Cohen's medical records and concluded in his "medical opinion that Mr. Cohen's medical status should be considered as 'high risk' under COVID-19 and exposure makes him more susceptible to becoming seriously ill from COVID-19 with the very real potential of death."

4. On May 18, 2020, I was advised by Regional Counsel at the BOP that officials at the central office in Washington, DC had reviewed Mr. Cohen's circumstances and materials and approved him for release on home confinement for the remainder of his sentence. I understood that this decision had been made in order to safeguard Mr. Cohen's well-being, given his health conditions and vulnerability to COVID-19.

5. On May 21, 2020, Mr. Cohen was released from detention at FCI Otisville pursuant to formal BOP authorization (the "Furlough Approval"), which indicated that Mr. Cohen was approved by the BOP for furlough from May 21, 2020 to June 20, 2020. Mr. Cohen provided a copy of the Furlough Approval to me on the following day. (Attached hereto as Exhibit A is a true and complete copy of the Furlough Approval for Mr. Cohen, provided to me by Mr. Cohen). Mr. Cohen's furlough was ultimately extended until his transition to home confinement, which I was told would occur on July 9, 2020.

6. On July 8, 2020, I spoke over the phone with U.S. Probation Officer Specialist Adam Pakula. I did so on behalf of Mr. Cohen and in anticipation of the upcoming meeting between Mr. Cohen and the U.S. Probation Office ("USPO") scheduled for July 9, 2020. Prior to this call, I had been aware that GEO Reentry Services ("GEO") had begun arranging with Mr. Cohen to begin his electronic monitoring for home confinement and that Mr. Cohen had been fully compliant with GEO.

7.      During our July 8, 2020 conversation, Probation Officer Pakula told me that Mr. Cohen should report to the USPO located at 500 Pearl Street in Manhattan at 11:00 am on July 9, 2020. Probation Officer Pakula stated that he would review paperwork with Mr. Cohen during the meeting, and that, immediately following the meeting, Mr. Cohen, Probation Officer Pakula, and others would return to Mr. Cohen's residence to place an electronic monitoring bracelet on Mr. Cohen. I offered no objection to this plan and indeed affirmatively agreed to it.

8.      During our discussion, I asked if Probation Officer Pakula could provide me with a copy of the paperwork in advance of the July 9, 2020 meeting. In making this request, I took particular care to express that my intention was not to ask Probation Officer Pakula for any favor or improper benefit. Probation Officer Pakula indicated that he understood and responded that he would run my inquiry up "the chain of command."

9.      During this conversation, Probation Officer Pakula advised me that the meeting at the USPO would last for approximately one hour, during which time Probation Officer Pakula would review with Mr. Cohen the terms and conditions of Mr. Cohen's Federal Location Monitoring Agreement ("FLM Agreement"). I asked Probation Officer Pakula whether it would be possible to add to the FLM Agreement a blanket permission to allow Mr. Cohen to visit with me as his attorney, with prior notice. Probation Officer Pakula responded that the process for Mr. Cohen to meet with his attorneys would be "part of the conversation" the following day.

10.     In addition, I asked Probation Officer Pakula why the USPO, rather than GEO, would be monitoring Mr. Cohen. Probation Officer Pakula stated that this question would be better directed to the BOP, but that the USPO does handle some cases like this on behalf of the BOP. Probation Officer Pakula stated that he could not give me any additional insight into why this occurred and that he would not comment.

11. Probation Officer Pakula also assured me that the USPO had told Patrick McFarland, the Residential Reentry Manager with the BOP, that the USPO would accept Mr. Cohen's FLM case.

12. Minutes after my call with Probation Officer Pakula, he sent me an email to advise that he was not authorized to release the paperwork prior to the meeting. I did not view this with any concern because I fully expected Mr. Cohen to be provided the opportunity to review, discuss, and ultimately execute the FLM Agreement as the next step in finalizing his home confinement.

13. On July 9, 2020, I accompanied Mr. Cohen to the meeting with the USPO located at 500 Pearl Street in Manhattan, as instructed by Probation Officer Pakula during our July 8, 2020 discussion. Once there, Mr. Cohen and I met with Probation Officer Pakula and Supervisory U.S. Probation Officer Enid Febus.

14. During the meeting, Probation Officer Pakula handed Mr. Cohen and me the FLM Agreement that Probation Officer Pakula had referenced the day before. (Attached hereto as Exhibit B is a true and complete copy of the FLM Agreement provided to me by Probation Officer Pakula on July 9, 2020). The proposed FLM Agreement contained eight numbered paragraphs.

15. The first numbered paragraph (the "Prior Restraint Provision"), caught both my attention and Mr. Cohen's. It stated that Mr. Cohen could not engage in the following activities:

> No engagement of any kind with the media, including print, tv, film, books, or any other form of media/news. Prohibition from all social media platforms. No posting on social media and a requirement that you communicate with friends and family to exercise discretion in not posting on your behalf or posting any information about you. The purpose is to avoid glamorizing or bringing publicity to your status as a sentenced inmate serving a custodial term in the community.

16. Mr. Cohen and I asked the Probation Officers if the FLM Agreement—and, in particular, its Prior Restraint Provision—was standard. Mr. Cohen commented that it did not appear to be.

17. Mr. Cohen commented that the Prior Restraint Provision would prevent him from publishing his book. Mr. Cohen and I also stated that we did not understand the restrictions placed on Mr. Cohen's family and friends. I expressed that, while Mr. Cohen could relay these restrictions to his family and friends, it was unclear how Mr. Cohen could ensure that his family and friends would comply with it, and that I was concerned that Mr. Cohen could be viewed as violating his conditions due to conduct over which he had no control.

18. I inquired of the Probation Officers if it were possible to adjust the broad language to better conform to the stated rationale in the last sentence of the paragraph; namely, that the Prior Restraint Provision was intended to "avoid glamorizing or bringing publicity to [Mr. Cohen's] status as a sentenced inmate serving a custodial term in the community." Ultimately, the Probation Officers suggested that we table the issue and proceed to review the remaining seven numbered paragraphs of the FLM Agreement, which we did. The Probation Officers stated that they would then send my inquiry regarding the language of the Prior Restraint Provision "up the chain of command" for a decision as to whether it could be adjusted to conform to the stated rationale.

19. Over the course of our meeting, I asked a number of clarifying questions to ensure that Mr. Cohen and I understood the conditions in the FLM Agreement, which the Probation Officers answered. Mr. Cohen expressed that he wanted to be certain that he understood all of the terms so that he would not inadvertently violate any conditions, and he stated that he had the utmost respect for them and everyone in the courthouse.

20. At no time did Mr. Cohen refuse to sign the FLM Agreement.

21. At no time did Mr. Cohen refuse *any* condition of home confinement.

22. At no time did Mr. Cohen refuse electronic monitoring.

23. Indeed, there was only passing mention of electronic monitoring, which occurred when I asked the Probation Officers what type of monitoring equipment would be used. Probation Officer Pakula responded that Mr. Cohen would be subject to radio frequency monitoring that would be installed at Mr. Cohen's home immediately following the meeting at the USPO. The Probation Officers stated that they would go through the electronic monitoring paperwork after we had finished reviewing the FLM Agreement with them. Mr. Cohen acknowledged that he understood what radio frequency monitoring was, and he and I both agreed to this without debate or dispute.

24. Mr. Cohen was never asked to execute the FLM Agreement. The Probation Officers invited Mr. Cohen and me to sit in a waiting area while they discussed the FLM Agreement, and the Prior Restraint Provision in particular, with their higher-ups. Mr. Cohen and I complied and waited for a total of approximately one and a half hours to sign the FLM Agreement.

25. While we were waiting, I knocked on the door and asked if everything was alright. Probation Officer Pakula assured me that they were just waiting for a response from their chain of command. Mr. Cohen and I continued to wait for that response so that Mr. Cohen could sign the FLM Agreement—in whatever form it took after it was taken "up the chain"—and proceed to have his electronic monitoring installed. Instead, we were shocked when three U.S. Marshals arrived to place handcuffs and shackles on Mr. Cohen.

26. I was then presented with an "RRC Failure" report signed by BOP Residential Reentry Manager Patrick McFarland, which falsely stated that Mr. Cohen had "failed to agree to the terms of Federal Location Monitoring" and was being remanded for that reason. (Attached

hereto as Exhibit C is a true and complete copy of that RCC Failure report). I explained that this was in error, as Mr. Cohen had not failed to agree to the terms, and that the parties simply had not yet finished the meeting. The Probation Officers did not deny this, but instead said that it was "out of [their] hands" and was an order from within the BOP.

27. Mr. Cohen said that he would sign the FLM Agreement then and there. I asked the Probation Officers if it were still possible for Mr. Cohen to sign the FLM Agreement as is. They stated that the FLM Agreement was "off the table."

28. Over my protestations and Mr. Cohen's pleas that he be allowed to sign the FLM Agreement, the U.S. Marshals took Mr. Cohen into custody and out of my presence.

29. I am aware of public statements made by the BOP on July 9, 2020 regarding Mr. Cohen. As reported in the press, I understood that Emery Nelson, a BOP spokesperson, asserted that Mr. Cohen was taken into custody for having "declined to agree to the terms" of his home confinement. The BOP also stated that: "As a federal inmate, Mr. Cohen remains subject to compliance with BOP policy, which includes being subject to electric monitoring and obtaining pre-approval for media interviews" and that "[a]s a result of his refusal to consent to the terms of the program, he was returned to a BOP facility for service of his sentence." For example, this public statement was reported in The New York Daily News on July 9, 2020 and can be viewed at the following link: https://www.nydailynews.com/news/politics/ny-michael-cohen-custody-20200709-yxt2ugy5cncqxgn26sjyg36xru-story.html.

30. On July 15, 2020, a reporter sent me an email with a statement from Justin Long, a spokesperson in the Office of Public Affairs at the BOP. The body of that statement, in relevant part, is provided below:

> We can provide the following response to your inquiry below:

> Michael Cohen had previously been approved for a furlough and was in the process of being placed into home confinement as part of the US Probation Office's Federal Location Monitoring (FLM) program. As part of Mr. Cohen's processing for home confinement, he was required to submit to the terms of such placement in the FLM program, which is generally described here: https://www.uscourts.gov/services-forms/probation-and-pretrial-services/supervision/federal-location-monitoring [uscourts.gov].
>
> Note, as a federal inmate, Mr. Cohen remains subject to compliance with BOP policy, which includes agreement to electronic monitoring and obtaining pre-approval for media interviews. He declined to agree with all of the terms of the FLM program, most notably electronic monitoring, and as a result, he was returned to a BOP facility for service of his sentence. The BOP appreciates the support of the US Probation Office and use of their FLM program that allows the BOP additional capacity for home confinement placements.

31. I am aware that at least portions of this statement by the BOP were reported in the press. For example, portions of this statement were reported in The Washington Post on July 16, 2020 and can be viewed at the following link: https://www.washingtonpost.com/news/powerpost/paloma/daily-202/2020/07/16/daily-202-michael-cohen-asked-to-sign-stay-out-of-jail-agreement-that-may-violate-his-first-amendment-rights-lawyers-say/5f0f9869602ff1080719cda0/.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: July 20, 2020
West Haven, Connecticut

Jeffrey K. Levine, Esq.

## **CERTIFICATE OF SERVICE**

I, E. Danya Perry, certify that on July 20, 2020, I caused the foregoing Declaration of Jeffrey K. Levine to be filed with the Clerk of the Court and served upon Respondents' counsel via email and registered mail, in accordance with an agreement between counsel.

/s/ *E. Danya Perry*
E. Danya Perry
