**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MICHAEL D. COHEN,

               Petitioner,

               v.

WILLIAM BARR, in his official capacity as
Attorney General of the United States,
MICHAEL CARVAJAL, in his official
capacity as Director of the Bureau of Prisons,
and JAMES PETRUCCI, in his official
capacity as Warden of the Federal
Correctional Institution, Otisville,

               Respondents.

No. 20 Civ. 5614 (AKH)

## MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
Attorney for Respondents
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone:  (212) 637-2679
Facsimile:  (212) 637-2686

ALLISON M. ROVNER
Assistant United States Attorney
   - Of Counsel

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................1

BACKGROUND ........................................................................................................3

I.      Petitioner's Crimes and Sentence .......................................................................3

II.     Home Confinement Generally ............................................................................3

III.    Petitioner's Request for Home Confinement and Subsequent Furlough ...........................5

IV.     The July 9, 2020, Meeting and Petitioner's Return to Custody .....................................6

        A.      The Federal Location Monitoring Program ....................................................6

        B.      The Federal Location Monitoring Agreement .................................................6

        C.      The Events of July 9, 2020 .....................................................................7

        D.      Petitioner's Return to FCI Otisville ..........................................................10

ARGUMENT .........................................................................................................12

I.      This Court Is Precluded from Reviewing BOP's Home Confinement Decision ...............12

II.     Petitioner Is Not Entitled to a Temporary Restraining Order ......................................13

        A.      Standard for Injunctive Relief ................................................................13

        B.      Petitioner Has Not Met His Burden of Proving that a Temporary Restraining
                Order is Warranted ...........................................................................15

                1.   Petitioner Has Not Demonstrated a Substantial Likelihood of Success
                     on the Merits ...........................................................................15

                2.   Petitioner Has Not Demonstrated that He Is Likely to
                     Suffer Irreparable Harm ..............................................................17

                3.   Petitioner Has Not Demonstrated that a Temporary Restraining Order Is in
                     the Public Interest or that the Balance of Equities Tips in His Favor .............18

CONCLUSION ......................................................................................................19

Respondents William Barr, in his official capacity as Attorney General of the United States, Michael Carvajal, in his official capacity as Director of the Bureau of Prisons, and James Petrucci, in his official capacity as Warden of Federal Correctional Institution, Otisville ("FCI Otisville") (collectively, "Respondents"), by their attorney, Audrey Strauss, Acting United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in opposition to Petitioner Michael D. Cohen's ("Cohen") emergency motion for a temporary restraining order, ECF No. 5 ("TRO Mot.").[1]   For the reasons explained below, this Court should deny Petitioner's emergency motion for a temporary restraining order.

## PRELIMINARY STATEMENT

Petitioner's contention that he was not placed on home confinement on July 9, 2020, in retaliation for a book that he is planning to publish that is critical of the President of the United States is not supported by the evidence.   As Respondents explain below, the evidence instead shows that Petitioner, who had been released from prison on furlough, was remanded into custody on July 9, 2020, because he was antagonistic during a meeting with probation officers at which he was supposed to sign the agreement that would have allowed him to complete the remaining portion of his criminal sentence in home confinement.   During the meeting with probation officers, Petitioner took issue with nearly every provision in the agreement relating to the terms and conditions of his home confinement.   In addition to expressing concerns about his book, Petitioner objected to the requirement that any employment be approved in advance by Bureau of Prisons ("BOP") and the Probation Office; that he refrain from contacting convicted felons; that he refrain

---

[1] Attached to this memorandum are declarations from Adam Pakula ("Pakula Decl."), Probation Officer Specialist at the United States Probation Office for the Southern District of New York; Jon Gustin ("Gustin Decl."), Administrator of the Residential Reentry Management Branch ("RRMB") at BOP; and Adam Johnson, Deputy Regional Counsel, Northeast Regional Office, BOP.

from grocery shopping (which would be performed for him by a family member); and to other language that he found confusing. Petitioner's attorney also objected to Petitioner being placed on electronic monitoring. And Petitioner stated during this discussion with the probation officers that he would not sign the agreement.

Contrary to Petitioner's claims, the home confinement agreement was not devised by anyone at BOP or in the executive branch—let alone a high-level official with any motive to prevent the release of Petitioner's book. Rather, the evidence shows that the agreement was drafted by a probation officer who had no knowledge that Petitioner was writing a book, based on a recent sample he obtained from a colleague. The decision to remand Petitioner back to prison was instigated by the probation officers who observed Petitioner's behavior at the meeting, and was ultimately made by a BOP employee who had no knowledge that Petitioner was writing a book.

In sum, Petitioner has made no showing that he is likely to succeed on the merits of his allegation that he was retaliated against for exercising his First Amendment rights—and in fact, the evidence strongly supports the contrary. Petitioner also has not shown irreparable harm. Pursuant to BOP's policy, he is free to work on his book while incarcerated. Other than a vague reference to his medical condition, Petitioner has provided no evidence supporting his allegation that he is likely to suffer irreparable harm as a result of the COVID-19 pandemic if he remains incarcerated.

While the Government sets forth herein the relevant sequence of events in response to Petitioner's allegations, the Court need not even reach them because the BOP's determination regarding whether to transfer Petitioner to home confinement is not subject to judicial review. The governing statute, 18 U.S.C. § 3621(b), provides that BOP "shall designate the place of the prisoner's imprisonment," and that this designation "is not reviewable by any court," *id.*

Accordingly, BOP's decision not to transfer Petitioner to home confinement falls within this unreviewable authority.

In sum, Petitioner has not shown a basis or need for a temporary restraining order. The Court should therefore deny Petitioner's motion for a temporary restraining order.

## BACKGROUND

### I.   Petitioner's Crimes and Sentence

On or about May 6, 2019, Petitioner began serving a three-year sentence at FCI Otisville based on his nine felony convictions relating to tax evasion, false statements, and campaign finance crimes.  Gustin Decl. ¶¶ 12-13.  On December 11, 2019, Petitioner filed a motion for a reduced sentence based on his purported substantial assistance to the Government, and on March 17, 2020, Petitioner filed a motion for compassionate release, stating that he was concerned about exposure to COVID-19 while in prison.  *See United States v. Cohen*, 18 Cr. 602 (WHP), ECF Nos. 58, 69, 71.  On March 24, 2020, Judge Pauley denied both motions, stating: "That Cohen would single himself out for release to home confinement appears to be just another effort to inject himself into the news cycle.  Ten months into his prison term, it's time that Cohen accept the consequences of his criminal convictions for serious crimes that had far reaching institutional harms."  ECF No. 72 at 2.

### II.  Home Confinement Generally

BOP has the sole discretion to transfer an inmate to home confinement.  Gustin Decl. ¶ 5; 18 U.S.C. § 3621(b).  This authority was expanded by the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020), which authorized the Attorney General to expand the cohort of inmates who can be considered for home confinement upon his finding of emergency conditions that are materially affecting the function of BOP.  Gustin Decl. ¶ 5.  In a memorandum dated March 26, 2020, Attorney General Barr directed BOP to

3

prioritize the use of its statutory authorities to grant home confinement to certain inmates, due to the COVID-19 crisis. *Id.* ¶ 6. This memorandum directed BOP, in making such decisions, to consider the totality of the circumstances and a non-exhaustive list of factors, such as the age and vulnerability of the inmate to COVID-19; the inmate's risk of recidivism; the inmate's conduct in prison; the inmate's re-entry plan; and the crime(s) of conviction. *Id.* In his April 3, 2020, memorandum, Attorney General Barr made the finding of emergency conditions that are materially affecting the function of BOP and directed BOP to continue making such decisions with dispatch, where appropriate, and to give priority to certain institutions with significant levels of infection. *Id.* ¶¶ 5-6. Although the memoranda set forth the criteria BOP is to consider in exercising its sole discretion to grant transfers to home confinement, neither memorandum entitles any particular inmate to transfer to home confinement. *Id.* ¶ 7.

BOP's procedural process for review and approval of a home confinement request contains multiple steps. Gustin Decl. ¶ 8. Typically, the process takes place while the inmate is confined in his institution. Gustin Decl. ¶ 9. However, in light of the risks posed by the COVID-19 pandemic, in some case, BOP has determined that it would promptly release an inmate on furlough (a form of temporary release) pending approval of the inmate's transfer to home confinement. *Id.* ¶ 10. Regardless of whether an inmate remains incarcerated or is released on furlough during the pendency of the home confinement review and approval process, the inmate is not formally transferred to home confinement until he signs the forms that he is presented containing the terms and conditions of his transfer to home confinement. *Id.* ¶¶ 9-10. Stated differently, the Warden's determination to transfer an inmate to home confinement is a conditional one, which requires the inmate's agreement to the conditions of his home confinement in order for his home confinement to be effectuated. *Id.* Inmates placed on home confinement remain in the custody of BOP, and as

4

such, the transfer of an inmate to home confinement is formally the equivalent of transferring the inmate from one place of incarceration to another.  *Id.* ¶ 11.

### III. Petitioner's Request for Home Confinement and Subsequent Furlough

In April 2020, Petitioner requested that BOP transfer him to home confinement for the remainder of his sentence, citing the COVID-19 pandemic and his claimed heightened vulnerability based on underlying health conditions.  Gustin Decl. ¶ 14.  Shortly thereafter, the Warden of FCI Otisville provisionally determined, in light of the CARES Act and guidance set forth in the Attorney General's memoranda, that Petitioner was eligible for transfer to home confinement.  *Id.* ¶¶ 15-16.  The BOP did not, as Petitioner alleges (TRO Mot. at 21), "determin[e] that Mr. Cohen was at serious risk of sickness and death if he remains in custody at Otisville."  *Id.* ¶ 16.  BOP's provisional determination was conditioned upon completion of the process described above and Petitioner's agreement to abide by appropriate conditions of home confinement.  *Id.*

On or about May 21, 2020, consistent with the procedures described above, Petitioner was released on furlough while the process for finalizing his transfer to home confinement was completed.  Gustin Decl. ¶ 17.  Before being released on furlough, Petitioner signed a form setting forth the terms and conditions of his furlough, which provided that Petitioner may not "[l]eave the area of his furlough without permission."  *Id.* ¶ 18.  Although Petitioner's expressed reason for seeking transfer was his concern about his special health risks if he contracted COVID-19, he was reportedly seen dining out at Manhattan restaurants on more than one occasion, including on July 2, 2020.  *Id.* ¶ 19.  Although the Government does not contend that this was the basis for Petitioner's remand, it is relevant to assessing the severity of Petitioner's claimed health concerns about COVID-19.

**IV. The July 9, 2020, Meeting and Petitioner's Return to Custody**

    *A. The Federal Location Monitoring Program*

    The United States Probation Office for the Southern District of New York ("Probation Office") provisionally agreed to supervise Petitioner's placement on home confinement pursuant to the Federal Location Monitoring ("FLM") Program.  Pakula Decl. ¶ 3; Gustin Decl. ¶ 20.  The Probation Office is an arm of this Court, not the BOP or executive branch.  Pakula Decl. ¶ 2.  Although the Probation Office typically supervises inmates who have been sentenced to a term of probation or who have completed their sentence of imprisonment and are serving a term of supervised release, the Probation Office occasionally provides courtesy supervision to BOP of inmates who have been placed in home confinement rather than prison.  *Id.*  This supervision is conducted under the FLM Program.  *Id.*  When the Probation Office conducts such supervision, it is permitted to set forth certain conditions under which it agrees to conduct such supervision.  These conditions are presented to the BOP for its concurrence; if the BOP does not concur with such conditions, the Probation Office may refuse to supervise the inmate.  Gustin Decl. ¶ 20.

    *B. The Federal Location Monitoring Agreement*

    Probation Officer Specialist Adam Pakula ("Pakula") was assigned to Petitioner's case.  Pekula Decl. ¶ 15.  Given the infrequency with which supervision occurs under the FLM Program, Petitioner was Pakula's first case under the FLM Program.  *Id.* ¶ 3.  In the FLM Program, the inmate typically executes an agreement setting forth the terms and conditions under which the Probation Office would supervise the inmate's home confinement.  *Id.* ¶ 6.  Pakula undertook to prepare such an agreement for Petitioner ("FLM Agreement").  *Id.* ¶¶ 5-13; Gustin Decl. ¶ 21.

    The FLM Agreement was not "custom-made" for Petitioner as a "gag order" by high levels of the executive branch as Petitioner suggests (TRO Mot. 1-9, 12).  Given that Petitioner was Pakula's first case under the FLM Program, Pakula lacked a model FLM Agreement from one of

his own cases.  Pekula Decl. ¶¶ 3, 7.  Therefore, Pakula obtained a sample from a colleague in another district who had experience with supervision of high-profile inmates under the FLM Program.  *Id.* ¶¶ 8-10 & Ex. A.

On July 7, 2020, Pakula drafted the FLM Agreement used in Petitioner's case.  Pakula Decl. ¶ 10.  Pakula used the model that his working group colleague had sent him, making only minor changes to the agreement.  *Id.*  In particular, the first condition, relating to Petitioner's contact with the media, was substantially the same as in the model his colleague had sent him.  *Id.*  Although Pakula was aware that Petitioner was a high-profile inmate at the time he drafted the FLM agreement, Pakula was not aware that Petitioner was writing a book.  *Id.* ¶ 11.

Later in the day on July 7, Pakula participated in a conference call with Supervisory Probation Officer Enid Febus; Assistant Deputy Chief U.S. Probation Officer Ed Johnson; and Patrick McFarland, a Residential Reentry Manager ("RRM") at the BOP.  *Id.* ¶ 12.  During the call, they reviewed the terms and conditions of the FLM Agreement that Pakula had drafted.  *Id.* ¶ 13.  Typically, the only BOP representative that reviews such an agreement is the assigned RRM, a relatively low-level employee of BOP.  Gustin Decl. ¶ 21.  Consistent with that practice, McFarland reviewed the FLM Agreement and stated that he concurred with all of its provisions.  Pakula Decl. ¶ 13;  Gustin Decl. ¶ 21.  McFarland later signed the FLM Agreement and sent the signed copy back to the Probation Office.  Pakula Decl. ¶ 13 & Ex. B (FLM Agreement).

### C.  *The Events of July 9, 2020*

On July 9, 2020, Petitioner arrived at the Probation Office to complete paperwork associated with the commencement of his placement in home confinement and was accompanied by his attorney Jeffrey Levine, Esq. ("Levine").  Pakula Decl. ¶ 14.  Probation Officer Specialist Pakula and Supervisory Probation Officer Febus presented Petitioner with the FLM Agreement.  *Id.* ¶ 15.  As they reviewed the agreement, Pakula found Petitioner to be combative.  *Id.* ¶ 16.

Petitioner and his attorney attempted to negotiate the language of nearly every provision of the agreement, and Petitioner refused to sign the agreement on at least one occasion.  *Id.*

Petitioner's objections to the FLM Agreement included: objecting to the first condition pertaining to his contact with the media, including by stating that he was writing a book "no matter what happens" and for Pakula to say hello to "Mr. Barr;" objecting to the second condition requiring that his employment be approved in advance by BOP or the Probation Office and asking various hypothetical questions about jobs he could hold, such as whether he could appear as a political correspondent on television or radio; objecting to the third condition, which prohibited him from contact with convicted felons or anyone under investigation by the U.S. Attorney's Office, noting that he wished to contact individuals he knew at FCI Otisville; objecting to the fifth condition requiring a family member to do grocery shopping for him, arguing that he should be able to do his own grocery shopping; objecting to the seventh condition, pertaining to types of leave other than work, medical and religious leave, because he found the wording to be confusing; and objecting to the eighth condition, pertaining to attorney visits, again, because he found the wording to be confusing.  Pakula Decl. ¶ 17(a)-(e).  Levine also objected to Petitioner's placement on electronic monitoring, stating that this was only for violent criminals.  *Id.* ¶ 17(f).

Given Petitioner's intransigence and because the Probation Office had provisionally agreed to supervise Petitioner as a courtesy to BOP, Pakula and Febus contacted the BOP to determine how it wished to proceed.  Pakula Decl. ¶ 18.  Pakula and Febus asked Petitioner and Levine to proceed to the waiting area while they contacted BOP.  *Id.*  Pakula and Febus contacted McFarland, the RRM manager for BOP on Petitioner's case.  *Id.* ¶ 19.  McFarland informed them that he would consult with his supervisors and determine how to proceed.  *Id.*  McFarland then contacted Erik Anderson ("Anderson"), who is the Sector Administrator for the Eastern Sector of the RRMB at

BOP.  Gustin Decl. ¶ 22.  Anderson, in turn, contacted Jon Gustin, Administrator of the RRMB at

BOP, at approximately 12:30 pm.  *Id.*  Anderson informed Gustin that Petitioner was at the

Probation Office and was refusing to sign the conditions of his placement into the FLM Program,

that he had objected to electronic monitoring, and that he was attempting to dictate the conditions

of his monitoring, including conditions relating to self-employment, access to media, use of social

media and other accountability measures.  *Id.* ¶ 22(a)-(c).

In Gustin's view, Petitioner's behavior was unacceptable and undermined his suitability

for placement in home confinement.  Gustin Decl. ¶ 23.  Gustin believed that if an inmate had

engaged in similar behavior prior to COVID-19 – when inmates typically remained in secure

custody until their transfer was completed and conditions were agreed upon – the inmate would

have simply remained in custody.  *Id.*  Gustin determined that Petitioner should be remanded to

secure custody rather than transferred to home confinement.  *Id.*  Gustin contacted Hugh Hurwitz,

the Assistant Director of the Reentry Services Division of BOP, and Gene Beasley, the Deputy

Director of BOP, and briefed them on the situation and his determination. *Id.* ¶ 24.  They concurred

with Gustin's determination to remand Petitioner to secure custody.  *Id.*  Gustin then emailed

Anderson and McFarland, directing them to ask the U.S. Marshall's Service ("USMS") to take

Petitioner into custody.  *Id.* ¶ 25.  McFarland later called Pakula and Febus and told them that

Petitioner was going to be remanded.  Pakula Decl. ¶ 20.  At approximately 2 p.m. on July 9,

Gustin was informed that Petitioner had been taken into custody.  Gustin Decl. ¶ 25; Pakula Decl.

¶ 20.

On July 10, Gustin was informed that Petitioner had apparently stated, as he was being

taken into custody, that he would in fact sign the FLM Agreement.  Gustin Decl. ¶ 26.  However,

by that point in time, Gustin had already determined that Petitioner should be remanded, had

directed his subordinates at BOP to do so, and Petitioner had in fact been remanded.  *Id.*  Although Gustin did not learn of Petitioner's last-minute offer to sign the conditions until well after he was returned to secure custody, had he learned of this statement earlier, it likely would not have changed his decision to remand Petitioner, given Petitioner's behavior prior to the appearance of the USMS.  *Id.* ¶ 26.  Gustin had not reviewed the FLM Agreement before it was presented to Petitioner, and was unaware of the language pertaining to contact with the media at the time he decided to remand Petitioner to BOP custody.  *Id.* ¶ 27.  Gustin was also not aware that Petitioner was writing a book, and Petitioner's intention to publish a book played no role whatsoever in Gustin's decision to remand Petitioner.  *Id.* ¶ 28.  Rather, Gustin's decision to remand Petitioner was based on his understanding that Petitioner had refused to acknowledge and sign the conditions of his transfer to home confinement.  *Id.* ¶ 29.

### D.  *Petitioner's Return to FCI Otisville*

Petitioner returned to FCI Otisville on July 9, 2020.  Johnson Decl. ¶ 3.  Although Petitioner was initially placed in the Special Housing Unit ("SHU") due to space limitations, by the next morning, he was transferred to Unit E.  Johnson Decl. ¶ 5.  Unit E is the COVID-19 quarantine unit at FCI Otisville.  *Id.*  Pursuant to BOP policies and procedures to reduce the risk that inmates in its custody will be infected with COVID-19, new inmates entering federal prison facilities are quarantined for approximately 14 days, during which time their movement is significantly restricted.  *Id.* ¶ 4.  In general, at the conclusion of the 14-day period, if the inmate tests negative, he or she will enter the general population.  *Id.*  Petitioner was placed in the quarantine unit at FCI Otisville, as are all new inmates, for the protection of the prison's inmate population.  *Id.* ¶ 5.  Petitioner has not, as he claims (TRO Mot. 1), been "imprisoned in solitary confinement because he is drafting a book manuscript that is critical of the President of the United States—and because he recently made public that he intends to publish this book shortly before the upcoming election."

FCI Otisville has indicated that Petitioner will be tested for COVID-19 on July 24. Johnson Decl. ¶ 6. If his tests results are negative for COVID-19, he will be released into the general population. *Id.* BOP facilities, including FCI Otisville, are under modified operations due to COVID-19, which includes, among other things, staggered meals and recreation times to limit large gatherings, suspension of non-essential visits, required screening of inmates and staff, quarantine and isolation procedures, provision of face coverings, and increased hygiene and sanitation. *Id.* ¶ 7. Because Petitioner does not seriously contest that the conditions of confinement at FCI Otisville are particularly unsafe as a result of COVID-19, Respondent does not discuss these policies and procedures in more detail, but will provide more information if the Court wishes. In any event, these policies and procedures appear to be working. As of today, only 2 of 63 inmates at FCI Otisville are considered active COVID-19 cases because they have tested positive for COVID-19. *Id.* ¶ 8.

Petitioner may work on his book while incarcerated at FCI Otisville to the extent allowed by BOP policy applicable to all inmates. Gustin Decl. ¶ 30 & Ex. A (BOP Program Statement 5350.27 pertaining to inmate manuscripts). BOP has instituted a policy "[t]o encourage inmates to use their leisure time for creative writing and to permit the direct mailing of all manuscripts as ordinary correspondence." *Id.* Inmates do not need staff approval to do this. *Id.* Although Petitioner asserts that he has "been unable to continue any meaningful progress on his book," this is a matter that is within Petitioner's, rather than Respondents', control.

**ARGUMENT**

**I.   This Court Is Precluded from Reviewing BOP's Home Confinement Decision[2]**

BOP's determinations regarding whether to transfer an inmate to home confinement are not subject to judicial review.  The governing statute provides that BOP "shall designate the place of the prisoner's imprisonment," and this designation "is not reviewable by any court."  18 U.S.C. § 3621(b).  The Supreme Court has acknowledged that "[i]t is well settled that the decision where to house inmates is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 39 (2002).  The practical reality is that prison administrators have finite resources for monitoring and providing case management to inmates.  As these officials decide how best to direct their resources to satisfy the policy goals of incarceration and ensure public safety, courts defer to their knowledge and expertise. *Cf. Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) ("[T]his Court has afforded considerable deference to the determinations of prison administrators, who in the interest of security, regulate the relations between prisoners and the outside world." (citation omitted)).

Although the statute does not define "place of imprisonment," a transfer of an inmate to home confinement falls within this unreviewable authority.  For example, a Louisiana district court presiding over a challenge to the COVID-19 conditions at a federal prison recently noted in granting dismissal that "[b]oth placement in a Residential Reentry Center ("RRC") (more commonly known as a halfway house) and on home confinement are within the BOP's discretion" under this provision. *Livas v. Myers*, No. 20 Civ. 00422, 2020 WL 1939583, at *6-8 (W.D. La. Apr. 22, 2020); *see also United States v. Yates*, No. 15 Civ. 40063, 2019 WL 1779773, at *4 (D. Kan. Apr. 23, 2019) ("[I]t is BOP—not the courts—who decides whether home detention is appropriate."); *United States v. Gould*, No. 05 Cr. 020, 2018 WL 3956941, at *1 (N.D. Tex. Jan.

---

[2] There may be bases other than the ones discussed in this brief that preclude the Court from reviewing BOP's decision.  Respondents reserve the right to raise these bases at a later date.

17, 2018) ("[T]he BOP is in the best position to determine whether RRC/halfway house placement would be of benefit to [the defendant] and to society in general."); *Fullenwiley v. Wiley*, No. 98 Civ. 1698, 1999 WL 33504428, at *1 (N.D.N.Y. Oct. 5, 1999) ("[D]iscretionary decisions by the BOP made pursuant to its authority under § 3621(b) are not subject to judicial review."). *But see, e.g.*, *Fernandez-Rodriguez v. Licon-Vitale*, No. 20 Civ. 3315 (ER), 2020 WL 3618941, at *29-30 (S.D.N.Y. July 2, 2020) (concluding that § 3621 did not preclude judicial review, although also recognizing that petitioners were challenging the prison's alleged failure to review and decide home confinement requests, rather than challenging any of the prison's individual decisions not to release specific inmates); *Martinez-Brooks v. Easter*, No. 20 Civ. 00569, 2020 WL 2405350, at *15 (D. Conn. May 12, 2020) (similar).

Petitioner's reliance on cases outside of the *habeas* context—and instead involving actions under 42 U.S.C. § 1983 (TRO Mot. 16)—for the assertion that a prison may not transfer inmates solely in retaliation for exercising their constitutional rights have no applicability to whether the Court may order an inmate's release in such a situation. These decisions demonstrate nothing more than that certain courts have held an inmate may bring an action for damages to redress retaliatory transfers, not *habeas* petitions requesting that the Court order their release. *See* 28 U.S.C. § 2241(c)(3) (*habeas* relief may be granted where petitioner is "in custody in violation of the Constitution or laws or treaties of the United States").

Accordingly, this Court should decline to review BOP's decision in this matter.

## II. Petitioner Is Not Entitled to a Temporary Restraining Order

### A. *Standard for Injunctive Relief*

The standard for a temporary restraining order is the same as for a preliminary injunction. *See Sterling v. Deutsche Bank Nat'l Tr. Co.*, 368 F. Supp. 3d 723, 726-27 (S.D.N.Y. 2019). Under either, the petitioner, "must establish that he is likely to succeed on the merits, that he is likely to

suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (citation omitted).

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005). To establish irreparable harm, plaintiffs must demonstrate that, in the absence of a preliminary injunction, "they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* (internal quotation marks omitted). A plaintiff must additionally "demonstrate a 'substantial' likelihood of success on the merits," where, as here, it "seeks a preliminary injunction that will alter the status quo." *N.Y. Progress*, 733 F.3d at 486 (citation omitted).

Further, "[w]henever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." *Time Warner Cable v. Bloomberg L.P.*, 118 F.3d 917, 929 (2d Cir. 1997). Under this standard, "[i]t is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010). Thus, injunctive relief should issue only where a plaintiff makes a "clear showing" and presents "substantial proof" that the relief is warranted. *Mazurek*, 520 U.S. at 972. Put otherwise, petitioners have the burden of proving the need for injunctive relief; respondent bears no burden to defeat the motion. *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 442-43 (1974).

**B.** *Petitioner Has Not Met His Burden of Proving that a Temporary Restraining Order Is Warranted*

1. *Petitioner Has Not Demonstrated a Substantial Likelihood of Success on the Merits*

Petitioner has failed to meet his burden of demonstrating a substantial likelihood of success on the merits. Petitioner's allegation that he was remanded to BOP custody as a result of a book he is writing about the President of the United States (TRO Mot. 13-20) is not supported by the evidence. Rather, Petitioner was remanded to FCI Otisville because of his defiant behavior during his meeting at the Probation Office on July 9, 2020, which included objecting to nearly every term and condition of the FLM Agreement that the Probation Officers presented to him. Pakula Decl. ¶¶ 14-20; Gustin Decl. ¶¶ 22-29. Petitioner not only objected to the first provision regarding his contact with the media, but also to the requirement that his employment while on home confinement be approved by the Probation Office and BOP (he posed various hypothetical employment scenarios, including asking if he could appear as a political correspondent on television or radio); that he refrain from contacting other convicted felons or anyone under investigation by the U.S. Attorney's Office (he stated that he wanted to contact inmates at FCI Otisville); that he refrain from grocery shopping (which would be performed for him by a family member); to restrictions regarding types of leave other than work, medical and religious leave (he stated that he found the condition confusing); and to a condition pertaining to attorney visits (which he, again, found confusing). Pakula Decl. ¶ 17(a)-(e); Gustin Decl. ¶ 22(a)-(c). Petitioner's attorney objected to Petitioner's placement on electronic monitoring, stating that this was only for violent criminals. Pakula Decl. ¶ 17(f). Petitioner stated in the meeting that he refused to sign the FLM agreement on at least one occasion. *Id.* ¶ 16.

Further, the FLM Agreement was not drafted or prepared based on any considerations having to do with preventing the release of Petitioner's book (TRO Mot. 1-9, 12). Rather,

Probation Officer Specialist Pakula—from an office that is an arm of this Court—drafted the FLM Agreement.  Pakula Decl. ¶¶ 2-3, 7.  Pakula was completely unaware that Petitioner even was writing a book.  *Id.* ¶ 11.  Because Pakula had never drafted such an agreement, he relied upon a model from a colleague in another district that had been approved for use with another high-profile inmate.  *Id.*  The FLM Agreement that Pakula prepared for Petitioner on July 7 was substantially identical to the agreement that Pakula's colleague had provided him.  *Id.* ¶¶ 9-11 & Exs. A-B.  BOP RRM McFarland approved the provisions of the FLM agreement with no changes.  *Id.* ¶ 13; Gustin Decl. ¶ 21.

The decision to remand Petitioner to FCI Otisville on July 9, 2020, was also devoid of any nefarious motive pertaining to Petitioner's book.  When Petitioner was defiant, it was the Probation Officers who escalated the situation to BOP.  Pakula Decl. ¶ 18.  Once BOP became involved, Gustin, Administrator of the RRMB at BOP, made the determination that Petitioner should be remanded, due to Petitioner's unacceptable behavior.  Gustin Decl. ¶¶ 23.  Petitioner's book played no role in Gustin's determination to take Petitioner back into custody, as Gustin was not even aware that Petitioner was writing a book.  *Id.* ¶ 28.  Rather, Gustin's decision to remand Petitioner was based on his understanding that Petitioner had refused to acknowledge and sign the conditions of his transfer to home confinement.  *Id.* ¶ 29.  Given that Gustin had not reviewed the FLM Agreement before it was presented to Petitioner, Petitioner's disagreement with the language pertaining to his contact with the media also played no role in Gustin's decision.  *Id.* ¶ 27.

There is also no merit to Petitioner's contention that once he was returned to FCI Otisville he was "imprisoned in solitary confinement because he is drafting a book manuscript that is critical of the President of the United States—and because he recently made public that he intends to publish this book shortly before the upcoming election" (TRO Mot. 1).  Upon his arrival at FCI

Otisville, Petitioner was quarantined, as are all new or returning inmates, pursuant to BOP's policies pertaining to COVID-19 in order to reduce the risk of spreading the virus. Johnson Decl. ¶¶ 4-5.

In sum, all concrete evidence contradicts Petitioner's assertion that he was remanded to FCI Otisville because of his book.

2. *Petitioner Has Not Demonstrated that He Is Likely to Suffer Irreparable Harm*

Petitioner has also failed to demonstrate that he will suffer irreparable harm if he is not released into home confinement. He does not seriously argue—let alone provide evidentiary support—for the proposition that his conditions of confinement at FCI Otisville present a substantial risk of serious harm due to the COVID-19 pandemic if he remains at FCI Otisville. He did not provide evidence regarding his medical conditions or of unsafe conditions of confinement at FCI Otisville in light of COVID-19. This is unsurprising, as BOP has extensive protocols in place to reduce the risk that inmates in custody will contract COVID-19, and at present, only 2 of 63 inmates at FCI Otisville are considered active COVID-19 cases because they have tested positive for COVID-19 and/or have COVID-19-related symptoms. Johnson Decl. ¶ 8. Further, Petitioner's dining out at Manhattan restaurants on more than one occasion while on furlough also undermines the severity of his claimed health concerns. Gustin Decl. ¶ 19. Contrary to Petitioner's contention (TRO Mot. 21), in making its provisional determination regarding home confinement, the BOP did not "determine that Mr. Cohen was at serious risk of sickness and death if he remains in custody at Otisville." Gustin Decl. ¶ 16. Instead, the decision was made in light of the CARES Act and the guidance set forth in the Attorney General's memoranda, and it was conditioned upon Petitioner's agreement to abide by the terms and conditions of his home confinement. Gustin Decl. ¶ 5-7, 15-16.

17

Further, Petitioner may work on his book while incarcerated at FCI Otisville to the extent allowed by BOP policy applicable to all inmates.  Gustin Decl. ¶ 30 & Ex. A.  BOP "encourage[s] inmates to use their leisure time for creative writing and [] permit[s] the direct mailing of all manuscripts as ordinary correspondence."  *Id.*  Inmates do not need staff approval to do this.  *Id.*

Accordingly, Petitioner has failed to prove irreparable harm.

3.  *Petitioner Has Not Demonstrated that a Temporary Restraining Order is in the Public Interest or that the Balance of Equities Tips in His Favor*

Petitioner has also failed to satisfy the remaining prongs for issuance of a temporary restraining order.  With respect to the public interest prong, in the context of the prison system, the Supreme Court has recognized that "the problems of prisons . . . require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government."  *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1973).  "[C]ourts," by contrast, "are ill equipped to deal with the increasingly urgent problems of prison administration and reform."  *Id.* at 405.  Running a prison "is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government."  *Turner v. Safley*, 482 U.S. 78, 85 (1987).  The "formidable task of running a prison" falls to those other two branches, and "separation of powers concerns counsel a policy of judicial restraint" and "deference to the appropriate prison authorities."  *Id.*  As one Texas district court recently noted, "the Court is ill suited to manage the day-to-day health care of prisoners, especially during a health crisis. . . .  [T]he Attorney General and the BOP are implementing plans to control the spread of the CO[VID]-19 virus and are better suited to manage prisoner health care."  *Jones v. Bergami*, No. EP-20-CV-132-DB, 2020 WL 2575566, at *2 (W.D. Tex. May 21, 2020).  If the Court ordered Petitioner's transfer to home confinement, it would interfere with the

prison's ability to effectively manage operations.  Accordingly, the public interest weighs against injunctive relief.

Finally, for all of the reasons described in this brief, the balance of equities does not tip in Petitioner's favor.

## CONCLUSION

For the foregoing reasons, Respondents respectfully request that the Court deny Petitioner's emergency motion for a temporary restraining order.

Dated:  New York, New York
        July 22, 2020

                                        Respectfully submitted,

                                        AUDREY STRAUSS
                                        Acting United States Attorney for the
                                        Southern District of New York
                                        Attorney for Respondents

                        By:     /s/ Allison M. Rovner_____
                                ALLISON M. ROVNER
                                Assistant United States Attorney
                                86 Chambers Street, 3rd Floor
                                New York, New York 10007
                                Telephone:  (212) 637-2691
                                Facsimile:  (212) 637-2750
                                E-mail:  allison.rovner@usdoj.gov