AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
Attorney for Respondents
By:     ALLISON ROVNER
        Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone:  (212) 637-2691
Facsimile:  (212) 637-2686
E-mail: allison.rovner@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL COHEN,<br><br>            Petitioner,<br><br>                v.<br><br>WILLIAM BARR, in his official capacity as Attorney General of the United States, MICHAEL CARVAJAL, in his official capacity as Director of the Bureau of Prisons, JAMES PETRUCCI, in his official capacity as Warden of the Federal Correctional Institution, Otisville,<br><br>            Respondents. | No. 20 Civ. 5614 (AKH) |

**DECLARATION OF JON GUSTIN**

**Introduction**

1.      I am currently employed by the Federal Bureau of Prisons ("BOP") of the United States Department of Justice, as the Administrator of the BOP Residential Reentry Management Branch ("RRMB") in Central Office, located in Washington, D.C. I began working for the BOP in October 1997 and assumed my current position in June 2015. Prior to becoming Administrator of RRMB, I worked in community corrections since March 2002.

2.      Residential Reentry Management staff develop and administer contracts for

community-based programs, including Residential Reentry Centers and home confinement. As

the Administrator of RRMB, I am responsible for the execution of BOP's residential reentry

management priorities nationwide. I provide leadership and management oversight of the three

Sector Management Teams and the numerous Residential Reentry Management field offices.

Field office staff are the primary point of contact for placement of individual inmates into home

confinement. Sector Administrators manage the field offices in their sector. I am responsible for

the development and implementation of national policy for RRMB, providing technical

assistance to managers at all levels within the BOP in interpretation and coordination of

community-based correctional activities. I also provide guidance and direction in the operations

of programs and services that are provided through intergovernmental agreements at the federal,

state, county, and city levels, and through contracts with private entities.

3.      As the Administrator for the RRMB, I am familiar with the statutes, regulations,

and policies that govern the BOP's designation of the location of an inmate's imprisonment and

the exercise of the BOP's discretion to transfer certain inmates to home confinement.

4.      I submit this declaration in connection with respondents' opposition to

petitioner's motion for a temporary restraining order in this case.  I base this declaration on my

personal knowledge, my review of BOP records to which I have access as part of my duties and

responsibilities, and my communications with BOP employees.

**Background on Home Confinement**

5.      The BOP has the sole authority to designate the place of a prisoner's

imprisonment. 18 U.S.C. § 3621(b). Although the BOP lacks the authority to release an inmate

from his sentence, the BOP has the authority and discretion to transfer an inmate to home

confinement for the remainder of his sentence pursuant to the provisions and limitations set forth in 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541. The CARES Act authorized the Attorney General to expand the cohort of inmates who can be considered for home confinement upon his finding of emergency conditions which are materially affecting the function of the BOP. On April 3, 2020, Attorney General William Barr made that finding.

6.      In a memorandum dated March 26, 2020, Attorney General Barr directed the BOP to prioritize the use of its statutory authorities to grant home confinement to certain inmates, due to the COVID-19 crisis. This memorandum directed the BOP, in making such decisions, to consider the totality of the circumstances and a non-exhaustive list of factors, such as the age and vulnerability of the inmate to COVID-19; the inmate's risk of recidivism; the inmate's conduct in prison; the inmate's re-entry plan; and the crime(s) of conviction. In his April 3, 2020 memorandum, Attorney General Barr directed the BOP to continue making such decisions with dispatch, where appropriate, and to give priority to certain institutions with significant levels of infection.

7.      Neither of Attorney General Barr's memos entitles any particular inmate to transfer to home confinement. Rather, these memos set forth the criteria for the BOP to consider in exercising its sole discretion to grant such transfers.

8.      Before an inmate can be transferred to home confinement, certain procedural steps must take place. After receiving an application for such transfer from an inmate, the inmate's institution gathers certain information. The Warden of the inmate's institution or his designee makes a provisional determination whether he believes the inmate is suitable for such a transfer. The information gathered by the Warden or his designee is then transferred to the RRM with responsibility for that geographic area. The RRM then determines whether the inmate will

be supervised through a residential reentry center ("RRC") or the U.S. Probation Office. The

packet of information is forwarded to the RRC or the U.S. Probation office for review and

acceptance into their program. The inmate must then acknowledge and sign the conditions of his

transfer to home confinement.

9.      Typically, the foregoing process takes place while the inmate is still in custody at

his institution. When this process is completed, the inmate typically would be presented with

documents setting forth the terms and conditions of his transfer to home confinement. Only upon

acknowledging and signing such conditions would the inmate be released from his institution

and formally transferred to home confinement. That is, the Warden's determination to transfer

such an inmate to home confinement is a conditional one, which requires completion of the

foregoing process and the inmate's agreement to the conditions of his home confinement.

10.     In light of the risks posed by the COVID-19 pandemic, in some cases the BOP

has determined that, rather than have the foregoing process take place while the inmate remains

in his institution, it would promptly release the inmate on furlough (a form of temporary release)

pending final approval of his transfer to home confinement. As set forth below, Michael Cohen

was one such inmate. In such cases, once the foregoing process is completed, the inmate is

required to meet with representatives of the RRC or Probation Office and acknowledge and sign

the conditions of his transfer to home confinement. Only upon the signing of such agreement is

the inmate formally transferred to home confinement.

11.     Inmates placed on home confinement remain in the custody of the BOP. As such,

the transfer of an inmate to home confinement is formally the equivalent of transferring the

inmate from one place of incarceration to another.

**The BOP's Determinations Regarding the Location of Michael Cohen's Imprisonment**

12.     On or about May 6, 2019, Michael Cohen began serving a three-year sentence based on his nine felony convictions related to tax evasion, false statements and campaign finance crimes.

13.     Between on or about May 6, 2019 and on or about May 21, 2020, Cohen was incarcerated at the minimum security satellite camp at FCI Otisville.

14.     In or about April 2020, Cohen requested that he be transferred to home confinement for the remainder of his sentence, citing the COVID-19 pandemic and his claimed heightened vulnerability based on underlying health conditions.

15.     Shortly thereafter, the Warden of FCI Otisville made a provisional determination that Cohen was suitable for transfer to home confinement.

16.     I have been informed that Cohen's recent court filings assert that the BOP "determined that Mr. Cohen was at serious risk of sickness and death if he remains in custody at Otisville." That is not correct. Rather, the Warden provisionally determined that, in light of the CARES Act and the guidance set forth in the Attorney General's memos, Cohen was eligible for transfer to home confinement. This determination was conditioned upon completion of the process described above and Cohen's agreement to abide by appropriate conditions of home confinement.

17.     On or about May 21, 2020, consistent with the process described above, Cohen was released on furlough while the process for finalizing his transfer to home confinement was completed.

18.     Before being released on furlough, Cohen signed a form setting forth the terms and conditions of his furlough. That form provides that Cohen may not "[l]eave the area of his furlough without permission."

19.     Although Cohen's expressed reason for seeking transfer to home confinement was his concern about special health risks if he contracted COVID-19, he was reportedly seen dining out at Manhattan restaurants on more than one occasion, including on or about July 2, 2020.

20.     The BOP asked the U.S. Probation Office for the Southern District of New York (the "Probation Office") to supervise Cohen under the Federal Location Monitoring Program ("FLM" or "FLM Program"). When the Probation Office conducts such supervision, it is permitted to set forth certain conditions under which it agrees to conduct such supervision. These conditions are presented to the BOP for its concurrence; if the BOP does not concur with such conditions, the Probation Office may refuse to supervise the inmate.

21.     In Cohen's case, the Probation Office prepared a draft agreement setting forth the conditions under which it would agree to supervise Cohen (the "FLM Agreement"). Typically, the only BOP representative that reviews such an agreement is the assigned Residential Reentry Manager, a relatively low-level employee of the BOP. Consistent with that practice, I did not review this agreement before it was presented to Cohen; I understand that within the BOP, it was reviewed only by Patrick McFarland, the assigned RRM. McFarland concurred with its terms.

22.     On or about July 9, 2020, at approximately 12:30 p.m., I received a call from Erik Anderson, who is the Sector Administrator for Eastern Sector of the RRMB. Anderson advised me that he had been contacted by McFarland, who in turn had been contacted by representatives of the U.S. Probation Office. Based on those conversations, Anderson advised me of the following, in substance and in relevant part:

a.    Cohen had been scheduled to report that day to the Probation Office for placement into the FLM Program.

b.    Cohen was currently at the Probation Office, and was refusing to sign the conditions of placement into the FLM Program.

c.    Cohen had objected to electronic monitoring, had been argumentative, and was attempting to dictate the conditions of his monitoring, including conditions relating to self-employment, access to media, use of social media and other accountability measures.

23.    In my view, Cohen's behavior and, in particular, his refusal to sign the conditions of home confinement was unacceptable and undermined his suitability for placement on home confinement. If an inmate had engaged in similar behavior prior to COVID-19 – when inmates typically remained in secure custody until their transfer was completed and conditions agreed upon – he would have simply remained in custody. I thus determined that Cohen should be remanded to secure custody rather than transferred to home confinement.

24.    I then contacted Hugh Hurwitz, the Assistant Director of the Reentry Services Division of the BOP, and Gene Beasley, the Deputy Director of the BOP, and briefed them on the situation and my determination. They concurred with my determination to remand Cohen to secure custody.

25.    I then sent an email to Anderson and McFarland directing them to ask the U.S. Marshals' Service ("USMS") to take Cohen into custody. At approximately 2 p.m. on July 9, I was informed that Cohen had been taken into custody.

26.    On or about July 10, 2020, I was informed that Cohen had apparently stated, as he was being taken into custody, that he would in fact sign the FLM Agreement. By that point in time, I had already determined that Cohen should be remanded, had already directed my

subordinates to ask the USMS to do so, and Cohen had in fact been remanded. Although I did

not learn of Cohen's last-minute offer to sign the conditions until well after he was returned to

secure custody, had I learned of this statement earlier it likely would not have changed my

decision to remand him, given his behavior prior to the appearance of the USMS.

27.     I have been informed that Cohen has stated that he objected to a condition in the

FLM Agreement relating to his contact with the media, and has claimed that this condition was

"custom-made" to prevent him from publishing a book. As noted, I did not review a copy of the

FLM Agreement before it was presented to Cohen on July 9, 2020. Although I am aware that the

BOP often places certain restrictions on inmates' contacts with the media, I had not seen the

particular language of the FLM Agreement drafted by the Probation Office before it was

presented to Cohen. As such, Cohen's failure to agree to this particular condition played no role

whatsoever in my decision to remand him to secure custody.

28.     At the time I determined to remand Cohen to secure custody, I was not aware that

Cohen was writing a book. Cohen's intent to publish a book thus played no role whatsoever in

my decision to remand him.

29.     Rather, my decision to remand Cohen was based on my understanding that Cohen

had refused to acknowledge and sign the conditions of his transfer to home confinement.

30.     Cohen may work on his book while incarcerated at FCI Otisville to the extent

allowed by BOP policy applicable to all inmates. *See* Ex A (BOP Program Statement 5350.27

pertaining to inmate manuscripts).  Under that policy, inmates are encouraged to use their leisure

time for creative writing and are permitted to mail all manuscripts as ordinary correspondence.

Inmates do not need staff approval to do this.

I, JON GUSTIN, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the

above statements are true and correct.

Dated:  New York, New York
        July 22, 2020

JON
GUSTIN

Digitally signed
by JON GUSTIN
Date: 2020.07.22
10:33:48 -04'00'

*J. Gustin*
_____
Jon Gustin
Administrator
BOP RRMB



**U.S. Department of Justice**
Federal Bureau of Prisons

# Program Statement

**OPI:** FPI
**NUMBER:** 5350.27
**DATE:** 7/27/99
**SUBJECT:** Inmate Manuscripts

1.  **PURPOSE and SCOPE.**  To encourage inmates to use their leisure time for creative writing and to permit the direct mailing of all manuscripts as ordinary correspondence.

2.  **SUMMARY OF CHANGES.**  This revision updates the Directives Referenced, adds a Program Objective and a Standards Referenced section, and makes other editorial and format changes consistent with current Bureau policy.  The requirement for an Institution Supplement has been eliminated.

3.  **PROGRAM OBJECTIVE.**  The expected result of this program is:

Inmates will be afforded the opportunity to write and mail manuscripts for publication.

4.  **DIRECTIVES AFFECTED**

   a.  **Directive Rescinded**

      PS 5350.07      Inmate Manuscripts (7/16/79)

   b.  **Directives Referenced**

      PS 5265.10      Correspondence (12/18/97)
      PS 5270.07      Inmate Discipline and Special Housing Units
                      (12/29/87)
      PS 5580.05      Personal Property, Inmate (9/30/96)
      PS 5800.10      Mail Management Manual (11/3/95)

   c.  Rules cited in this Program Statement are contained in 28 CFR 551.80 through 551.83.

**[Bracketed Bold - Rules]**
Regular Type - Implementing Information

PS 5350.27
7/27/99
Page 2

5.  **STANDARDS REFERENCED**

   a.  American Correctional Association 3rd Edition Standards for Adult Correctional Institutions:  3-4428 and 3-4429

   b.  American Correctional Association 3rd Edition Standards for Adult Local Detention Facilities:  3-ALDF-5D-01

   c.  American Correctional Association 2nd Edition Standards for Administration of Correctional Agencies:  None

   d. American Correctional Association Standards for Adult Correctional Boot Camp Programs:  1-ABC-5C-06 and 1-ABC-5D-01

6.  **[DEFINITION.  §551.80.  As used in this rule, "manuscript" means fiction, nonfiction, poetry, music and lyrics, drawings and cartoons, and other writings of a similar nature.**

7.  **[MANUSCRIPT PREPARATION §551.81.  An inmate may prepare a manuscript for private use or for publication while in custody without staff approval.  The inmate may use only non-work time to prepare a manuscript.]**

8.  **[MAILING INMATE MANUSCRIPTS §551.82.  An inmate may mail a manuscript as general correspondence, in accordance with Part 540, Subpart B of this chapter.  An inmate may not circulate his manuscript within the institution.]**

Part 540, Subpart B refers to the Program Statement on Correspondence.

9.  **[LIMITATIONS ON AN INMATE'S ACCUMULATION OF MANUSCRIPT MATERIAL §551.83.  The Warden may limit, for housekeeping, fire-prevention, or security reasons, the amount of accumulated inmate manuscript material.]**

The Warden may choose to address the issue of accumulation of inmate manuscripts in the Institution Supplement on Inmate Personal Property.


                                        /s/
                                  Kathleen Hawk Sawyer
                                  Director