```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MICHAEL D. COHEN,

                Petitioner,

         v.                           20 CV 5614 (AKH)

WILLIAM BARR, in his official
capacity as Attorney General
of the United States, et al.,

                Respondents.          Hearing
------------------------------x
                                      New York, N.Y.
                                      July 23, 2020
                                      11:00 a.m.
Before:

                HON. ALVIN K. HELLERSTEIN,

                                      District Judge


                        APPEARANCES

PERRY GUHA LLP
     Attorneys for Petitioner
BY:  E. DANYA PERRY
     SAMIDH GUHA
     GEORGE M. BARCHINI
     -and-
VERA EIDELMAN
BRIAN HAUSS
ARIANNA DEMA

AUDREY STRAUSS
     Acting United States Attorney for the
     Southern District of New York
ALLISON ROVNER
THOMAS McKAY
     Assistant United States Attorneys
```

1           (Case called)
2           THE COURT:  This is Judge Hellerstein.  The case is
3  Cohen v. Barr, 20 CV 5614.
4           Ms. Perry, are you on?
5           MS. PERRY:  Yes, your Honor.  Good morning.  This is
6  Danya Perry from Perry Guha.
7           THE COURT:  Are there any different appearances from
8  your side, from the plaintiff's side?
9           MS. PERRY:  Yes, your Honor.  I am joined by my
10 partner, Samidh Guha, and my colleague, George Barchini.  We
11 are also joined by cocounsel from the ACLU, and I will let them
12 make their own appearance.
13          THE COURT:  Thank you.
14          Ms. Rovner, are you on the line?
15          MS. ROVNER:  Yes, your Honor.  I also have another
16 AUSA, Thomas McKay on the line.  He handled Mr. Cohen's
17 criminal case.  He could perhaps answer any questions that your
18 Honor has that I cannot answer.
19          THE COURT:  Thank you, Mr. McKay.
20          MS. EIDELMAN:  Your Honor, this is Vera Eidelman, also
21 on behalf of petitioner, from the ACLU, joined by my
22 colleagues, Brian Hauss and Arianna Demas.
23          THE COURT:  Thank you, all.
24          Let me caution people on this line.  There are a
25 hundred people on the line.  They all must mute their phones.

These are not easy circumstances. And if there is any noise in the background, we can't accomplish our purposes, so I will need your cooperation.

This is now a resumed hearing. I've had the benefit of the government briefs and declarations and the reply brief and declaration.

I would like to ask you, Ms. Rovner, apart from condition 1, what other conditions, if any, did Mr. Levine and Mr. Cohen refuse to sign?

MS. ROVNER: Your Honor, Mr. Cohen also objected to -- let me open up the exhibit so I can tell you the condition numbers.

He objected to condition 2, which required that his employment be approved by the United States Probation Office, the Bureau of Prisons. He objected to that condition.

He also objected to the specific condition that he not have contact with convicted felons and made a statement that he wanted to communicate with people at FCI Otisville and that's condition 3.

He objected to condition 5, which merely requires that his family members do food shopping and other regular household shopping errands for him. He questioned that condition.

And then he found the language of condition 7 and 8 confusing. 7 pertains to leave requests that are not medical or religious, and condition 8 pertains to meetings with his

1  attorney.

2  THE COURT: When he questioned these, I understand
3  from the declarations that instead of negotiating further or
4  explaining what the government's conditions were and that could
5  not be changed, instead you adjourned the meeting and took it
6  up to higher authorities and never again responded to Mr. Cohen
7  or Mr. Levine. The declarations seem to agree on that. Am I
8  correct, Ms. Rovner?

9  MS. ROVNER: Your Honor, I neglected to add one thing.
10 His attorney also objected to a request to electronic
11 monitoring and argued that was only for more violent prisoners.

12 (Court reporter cut off from call)

13 THE COURT: Anything further that we missed
14 Ms. Rovner?

15 MS. ROVNER: I think I was explaining how Adam Pakula,
16 the probation officer, said that he was being combative, and
17 then the totality of Mr. Cohen being combative, and then had
18 Mr. Cohen and his attorney wait, and went and contacted BOP.
19 It was John Gustin, the Residential Reentry Management Branch
20 administrator at BOP, who made the decision to take
21 Mr. Cohen -- to remand him back to Otisville.

22 But I think, to more directly address your Honor's
23 point, he wasn't given a chance then to agree and sign. But
24 Mr. Cohen had already refused to sign the agreement, and I
25 don't think that BOP is necessarily required to give him a

1  chance to negotiate home confinement.  He had not been granted
2  home confinement yet.  It was contingent on him agreeing to the
3  terms and conditions of his home confinement, which he had made
4  clear that he had already refused to do at least once
5  expressly.
6          THE COURT:  I'm looking at Mr. Pakula's declaration
7  and in paragraph 15 he describes the meeting.  Paragraph 16 he
8  says Cohen was combative.  Cohen and his attorney attempted to
9  negotiate the language of nearly every provision of the
10 agreement, and Cohen stated on at least one occasion that he
11 would not sign the agreement.  Cohen makes it clear in his
12 declaration that other than go to jail, if he knew that that
13 was the last stop, he would have signed, and he was never given
14 that opportunity.
15         It seems to me that what Mr. Pakula is saying is
16 combative is an attorney's effort to negotiate an agreement,
17 which is very common.  That doesn't necessarily mean that the
18 person won't sign.  It means that the attorney is trying to get
19 the best deal possible for his client.  And Mr. Cohen was never
20 given a chance to say, if this is it, I will sign.
21         This negotiation, we have the interpretation of
22 intransigence.  I don't think it's a fair inference.
23         MS. ROVNER:  My understanding is that it is not common
24 for an inmate or his attorney to negotiate the terms and
25 conditions of home confinement.

1            I think it's also important to note that home
2    confinement means that Mr. Cohen was still in BOP's custody.
3    It was just a different location that he was within custody.
4            THE COURT:  We are not talking about locations.
5    That's a false issue.  We are talking about the issue of
6    retaliation.  He was put on furlough with no conditions other
7    than hang around your house and be in your neighborhood, the
8    only condition.  And when it came time for the furlough period
9    to end, he was allowed to stay outside, without any conditions
10   other than that.
11           All of a sudden, when the New York Post article comes
12   out and the Bureau of Prisons understands that Cohen is writing
13   a book and will likely finish before the election time, he is
14   imposed with conditions.
15           Pakula doesn't give him a form.  Pakula doesn't give
16   him the form of home confinement that typically is used by
17   probation.  Pakula says that he called a colleague somewhere
18   else and got a form that was a one-time use by the colleague
19   and gave that form.  Why couldn't something like that be a
20   subject of negotiation with an attorney?  What's an attorney
21   for if he is not going to negotiate an agreement with his
22   client?
23           Mr. Pakula dealt with attorneys.  He knew what
24   attorneys were.  He knew the negotiations occur.  Negotiations
25   occur as to how strict supervision will be and what the term of

the supervision will be, who can shop, and whether you can go out for work or whether you can go out for religious services. That's a common thing of discussion. If you want to call discussion negotiation, you can call it.

I can't see that there is a fair inference made that because an attorney is negotiating, there is an exhibit of intransigence on the part of the defendant.

MS. ROVNER: Your Honor, first of all, I think it's not unlawful for BOP to refuse to negotiate. And petitioner's cause of action is a First Amendment. And BOP's refusal to negotiate doesn't seem to be relevant to that and it's certainly not retaliatory.

Your Honor noted that the agreement that was reached with Mr. Cohen may not have been the same as what's typically used with home confinement. But Mr. Cohen's home confinement was part of the federal location monitoring program which the probation office administers rather than BOP. The probation officer who drafted the agreement had no knowledge that Mr. Cohen was writing a book.

THE COURT: Who is that, someone that Pakula called?

MS. ROVNER: Pakula was the person who drafted the federal location monitoring --

THE COURT: He didn't draft it. He took some of the notes from a document. We don't know. Someone else wrote the document and then presented it.

1          MS. ROVNER:  The person who he got the document from,
2     though, was another probation officer in another district.
3          THE COURT:  How do we know what he knew or didn't
4     know?
5          MS. ROVNER:  Your Honor, you know because the
6     declaration had been drafted.  I don't have the e-mail in front
7     of me, but I believe it was in May it was drafted for another
8     high-profile inmate by this probation officer, and it was May
9     28 that the other probation officer sent it to Pakula, and it
10    was before anyone saw Mr. Cohen out dining.
11         THE COURT:  Mr. Pakula asked for it.  What purpose
12    would there be in a paragraph 1 preventing engagement with
13    media, TV, print, film, books, prohibiting social media
14    platforms?  No posting on social media, communications with
15    friends not to do certain things about publication.
16         What purpose would that have unless Pakula was asking
17    for something like that?
18         MS. ROVNER:  Pakula is just trying -- he never drafted
19    an agreement like this.
20         THE COURT:  I have never seen such a clause.  In 21
21    years of being a judge and sentencing people and looking at the
22    terms and conditions of supervised release, I have never seen
23    such a clause.
24         Have you, Ms. Rovner, ever seen such a clause?
25         MS. ROVNER:  I have never seen a federal location

1    monitoring agreement, your Honor.

2              THE COURT:  Why would Pakula ask for something like
3    this unless there was a purpose to it, unless there was a
4    retaliatory purpose saying, you tow the line about giving up
5    your First Amendment rights or we will send you to jail.  We
6    are not going to negotiate about it because if you negotiate,
7    we are going to send you to jail and call you intransigent.

8              How can I take any other inference other than it was
9    retaliatory?

10             MS. ROVNER:  Pakula had no knowledge about Mr. Cohen's
11   book, and he got the sample from another probation officer.

12             THE COURT:  It's impossible to take that inference.

13             MR. McKAY:  Your Honor, this is Thomas McKay.  Can I
14   just jump in with a factual point on the timeline?

15             THE COURT: Mr. McKay, is Mr. Rovner not capable of
16   answering my questions?

17             MR. McKAY:  She certainly is, your Honor.

18             THE COURT:  You will keep quiet and if Ms. Rovner
19   wants to consult you, she may.  One person speaks on a side.

20             There is no purpose that I can discern, from having
21   this paragraph 1, that I can find in any term or condition of a
22   supervised release that I have seen in 21 years of being a
23   judge.  You already know about it.  Nor is it feasible to
24   believe that Pakula wasn't asking for something like this
25   because he had some instruction about the something like this.

1          MS. ROVNER: Your Honor, Pakula actually didn't ask

2    for it.  He just sent it and it was before he was assigned

3    Mr. Cohen's case.

4          (Court reporter cut off from call)

5          THE COURT: If he came up with this, he had to be told

6    about the need for something or the desire for something like

7    this.  And then Ms. Rovner was answering that it was part of a

8    working group that was discussing something or other, and I

9    missed what Ms. Rovner was saying.

10         MS. ROVNER: Mr. Pakula was part of a working group

11   with some other probation officers from other districts where,

12   among other things, they discussed better location monitoring.

13         And this e-mail, which is attached as Exhibit A to

14   Mr. Pakula's declaration, it's an e-mail to Mr. Pakula from one

15   of the probation officers in his group.

16         And it says that: I have received a few high-profile

17   FLM, which stands for federal location monitoring, requests

18   since we last collaborated.

19         I came up with a list of additional criteria that my

20   brass and the BOP approved as having the potential FLM

21   participant agree to ahead of time, in addition to the FLM

22   conditions, and he is saying that in this particular case he

23   reviewed the FLM form with the offender and then e-mailed the

24   offender the document and had him sign it before the probation

25   office would formally agree to federal location monitoring.

1  THE COURT: I see this document. It comes from the
2  United States Probation Office of the Eastern District of
3  Pennsylvania, and it gives a form letter.
4   But this document is not vetted in the normal way in
5  the probation office. Mr. Fitzpatrick, the head of the office,
6  doesn't sign off on it or see it. It's not part of the forms
7  typically used by the probation office. And that will be
8  expected if the probation office, as is said here, is delegated
9  its function of supervision by the Bureau of Prisons.
10   I cannot believe fairly that there was not a purpose
11  in paragraph 1 of the location monitoring to stop exercise of
12  First Amendment rights, and that's my finding.
13   The instances of retaliation are laid out in the
14  papers by the plaintiff. I don't need to go into them here.
15   But I want to ask you, Ms. Perry, if I were to give an
16  injunction, what should its terms be?
17   MS. PERRY: Thank you, your Honor.
18   We believe that he should not be subject to any of the
19  restrictions in the prior restraint provision, which is in
20  paragraph 1 of the FLM agreement.
21   THE COURT: Does that include a television studio?
22   MS. PERRY: Your Honor, first of all, I think that
23  that would be constitutionally permissible and it would not
24  serve any legitimate penological objectives to deny him that.
25   THE COURT: He can invite all the press and get a

1  large apartment, 20 or so people will come in, and give a
2  publicity release and tout his book. You think that's part of
3  his constitutional rights?
4      MS. PERRY: I believe that the Bureau of Prisons has
5  an obligation to work with Mr. Cohen, which is exactly what he
6  was trying to do, to figure out the appropriate contours of
7  what he can and can't do.
8      THE COURT: Tell me what the appropriate contours is.
9  Mr. Cohen is a prisoner. He may be confined in his own home,
10 if I grant this injunction against retaliation, but he remains
11 a prisoner in his home. And just as you wouldn't have a press
12 conference from a jail cell, you shouldn't be allowed to have a
13 press conference from your home. You can communicate. You can
14 discuss. You can post on social media. You can do all those
15 sorts of things. But you can't make a confinement into a free
16 person. You can't make a person confined in jail or at home
17 into a totally free person. There has got to be a limit.
18     MS. PERRY: Your Honor, we agree with that. He wants
19 to be able to edit and publish his book. He would like to be
20 able to work, subject to approval by the Bureau of Prisons, and
21 that approval has to be within the bounds of what would serve
22 an appropriate penological interest.
23     THE COURT: What would the penological interest be?
24 Is there a proper penological inference that a person considers
25 himself as if in jail, even though he is confined to home, and

1  act accordingly?

2          MS. PERRY:  Your Honor, I think he should be permitted
3  to post on social media and to speak his mind.  He obviously
4  has something to say of great public interest.  Just like any
5  prisoner, he can't incite riot.  He had some restraints on him
6  while he was in Otisville, and we think those would remain
7  appropriate.

8          I do think this is an area where we can work with the
9  Bureau of Prisons and find out exactly what their objective is
10 because their stated objective of not glamorizing the condition
11 of home confinement obviously is pretextual.  I think the
12 burden is on them to state what the objective is, and then
13 Mr. Cohen will be happy to work with them and to appropriately,
14 under appropriately tailored conditions, to absolutely abide by
15 them.  I don't know what the Bureau of Prisons is looking to
16 do.

17         THE COURT:  Condition No. 3 is a prohibition on
18 contact with any convicted felons.  Mr. Cohen says he wants to
19 contact convicted felons to interview them.  That's in
20 violation of condition 3.  Condition 3 is a normal condition.

21         Do you have any problem with it?

22         MS. PERRY:  We don't, your Honor.  I would say there
23 is an oddity of condition 3, which says that he also can't
24 contact anyone currently under investigation by the U.S.
25 Attorney's Office, but it also appears to have been custom made

1    for Mr. Cohen because --

2             THE COURT:  It's a normal term, I believe.

3             MS. PERRY:  Anyone that he knows to be under

4    investigation, of course, is appropriate, and he would abide by

5    that.  He agreed to that at the meeting, and he will agree to

6    that today.

7             THE COURT:  How about the condition of agreeing to any

8    employment?  The probation officer said to agree to employment.

9             MS. PERRY:  Your Honor, he agrees to each of those

10   other conditions.  He -- and, as you said, it was appropriately

11   so -- and his attorney were trying to understand the contours

12   of what he was and was not allowed to do so that he would not

13   be in violation.

14            THE COURT:  He said that, but you can read this and

15   understand what it is.

16            MS. PERRY:  Your Honor, he wasn't confused by the

17   condition.  He wanted some meat filled in on the bone.  If he

18   needs prior approval for attendance at a religious service, how

19   much prior approval.  Is it a week, is it a day?  Does a bris

20   count or can he visit his rabbi?  What is meant?  And maybe he

21   was being overly lawyerly.  But he did really want to, just as

22   he did before he left Otisville, he did want to understand very

23   clearly the parameters of his conditions of release so that he

24   wouldn't violate them.

25            He agrees to each of these conditions 2 through 8.  To

1  be very clear, it would certainly be helpful to have some
2  guidelines to what exactly is meant because he does not want to
3  be back in the same position where he is ambushed with some
4  sort of violation because he didn't quite understand the terms.
5          THE COURT:  We have the terms here.  Are any of these,
6  besides No. 1, objectionable?
7          MS. PERRY:  No, your Honor.
8          THE COURT:  We have Mr. Cohen then agreeing to
9  conditions 2 through 7.
10         MS. PERRY:  Yes, your Honor.
11         THE COURT:  What do you think --
12         MS. PERRY:  And 8 as well, your Honor.
13         THE COURT:  Pardon?
14         MS. PERRY:  There is a condition 8 that he also agrees
15 to.
16         THE COURT:  I only saw seven.
17         MS. PERRY:  It's on the following page, your Honor.
18 It's approval for him to meet with his attorney, at the
19 attorney's request, in advance.
20         THE COURT:  Yes.
21         How should No. 1 be modified?  The purpose is to avoid
22 glamorizing or bringing publicity to your status as a sentenced
23 inmate serving a custodial term in the community.
24         MS. PERRY:  Yes, your Honor, we agree with that.
25         THE COURT:  Ms. Rovner, if I were to give an

1  injunction, I would ask the two of you to negotiate condition 1

2  so that it's consistent with a First Amendment, but yet serve

3  the purposes of confinement.  Would you be able to do it?

4         MS. ROVNER:  I think so, your Honor.  I was actually

5  going to ask that we have a couple of days to attempt to

6  negotiate the conditions.  Counsel agrees to 2 through 8, but I

7  would like time to confer internally with BOP and with counsel

8  about this, if your Honor is inclined --

9         THE COURT:  How long should Mr. Cohen be in jail?  If

10 I find that this has been retaliatory, shouldn't he be restored

11 to the condition he was?

12        MS. ROVNER:  One thing, your Honor, which I don't

13 totally know the answer to, is we know that he's in quarantine

14 right now.  I'm not sure of the answer to this.  If before --

15        THE COURT:  At the direction of the jail.  If he is

16 going back to his home, which is what I would contemplate, we

17 only have to worry if his wife objects.  I don't believe she is

18 objecting.

19        MS. PERRY:  Your Honor, she is not objecting.  I have

20 discussed this with her.  He will be picked up from the Bureau

21 of Prisons, from Otisville, by his son, who also would be in

22 quarantine with Mr. Cohen and Mrs. Cohen.

23        And we would agree, should he be released -- we do ask

24 your Honor to release Mr. Cohen immediately.  And we would

25 agree to the imposition of condition 1, pending this discussion

1  and negotiation with the U.S. Attorney's Office over the next
2  few days, or however long it takes them, so that he doesn't
3  have to wait while we are negotiating.
4              THE COURT:  I think, Ms. Rovner, that's reasonable.
5  He continue his quarantine at home.  We would keep him here for
6  one more day, until he gets tested, and he gets released
7  tomorrow.  And the test results would then be communicated to
8  the probation officer and to Mr. Cohen.
9              MS. ROVNER:  Your Honor, I think that's reasonable and
10 acceptable, if your Honor is inclined to grant the injunction.
11             THE COURT:  Who is speaking?
12             MS. ROVNER:  This is AUSA Allison Rovner.
13             MS. PERRY:  Your Honor, one quick note.  He has been
14 in solitary confinement since July 9.
15             THE COURT:  I'm told he was, and you were told that he
16 was moved out from solitary confinement to the quarantine unit,
17 unit E.
18             MS. PERRY:  Your Honor, maybe it's a question of word
19 play.  He has been quarantined in what they call solitary
20 confinement.  He is by himself all day every day.  So he has
21 not had contact with another human.
22             THE COURT:  He could stand one more day.
23             MS. PERRY:  Yes, your Honor.
24             THE COURT:  Let him be tested tomorrow morning,
25 Ms. Rovner, and he should be released by 2 p.m. to his son.

1      Ms. Perry, tell me, who is going to be the custodian?
2 Is his wife be a custodian?
3      MS. PERRY:  Yes, your Honor.
4      THE COURT:  Does she need to sign anything
5 satisfactory to the probation office?
6      MS. PERRY:  I don't believe so, your Honor.  Under the
7 conditions that were to have been imposed, I don't believe she
8 was, but she certainly is more than willing to.
9      THE COURT:  And she will be taking care of shopping
10 and everything else.  Mr. Cohen will be confined to his home
11 except subject to conditions stated in the agreement.
12      MS. PERRY:  Yes, your Honor.
13      THE COURT:  I think we have it.
14      I make the finding that the purpose of the
15 transferring Mr. Cohen from furlough and home confinement to
16 jail is retaliatory and it's retaliatory because of his desire
17 to exercise his First Amendment rights to publish a book and to
18 discuss anything about the book or anything else he wants on
19 social media and with others.
20      Counsel for Mr. Cohen agrees to the eight conditions
21 set out in the federal location monitoring program participant
22 agreement tended to him by Mr. Pakula, subject to renegotiation
23 of the first term.  And with respect to that, the last sentence
24 of that first paragraph will be retained and there can be
25 further negotiation if that has to be defined, but in a way

1   that's consistent both with the First Amendment and penological
2   purposes.
3              That's my essential finding and the injunction is
4   against continuing retaliation against Mr. Cohen by keeping him
5   in jail when he should be confined, as he was before the
6   retaliation, at home.
7              I will issue a written decision further explaining my
8   reasoning, but this decision is a final decision.
9              Does counsel wish to give me terms of an injunction or
10  should I craft one myself?
11             MS. PERRY:  Your Honor, I suppose that the permanent
12  injunction would be subject to --
13             THE COURT:  Why don't I do it myself now and it's
14  subject to being replaced by a consent agreement given to me by
15  counsel.
16             MS. PERRY:  Perfect, your Honor.
17             THE COURT:  How much time shall I give you to
18  negotiate?
19             MS. PERRY:  I think we can do it immediately, but I
20  leave it to AUSA Rovner.
21             THE COURT:  Let's say a week.
22             MS. ROVNER:  Your Honor, did you say a week?
23             THE COURT:  I was thinking a week for the discussion.
24             MS. ROVNER:  I think that's feasible.
25             THE COURT:  Let's say a week.  If you need more time,

1  you'll ask for it.
2          In the meantime, condition 1, as it is stated in the
3  agreement, stands for that period of time.  I will continue to
4  maintain jurisdiction so that if there is no agreement within
5  the week, Ms. Perry can ask me to hear you again.
6          Have I missed anything, Ms. Rovner, that I should be
7  touching upon?
8          MS. ROVNER:  I don't think so, your Honor.
9          THE COURT:  Ms. Perry.
10          MS. PERRY:  No, your Honor.
11          THE COURT:  This matter is closed.  Thank you very
12  much.
13          (Adjourned)